Price A. BAUM; Margaret Leedy, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee,

v.

Michael A. MASSEY, Third Party Defendant–Appellee.

No. 91–1608.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 4, 1991.

Decided Feb. 23, 1993.

---

John Philip Kessel, Chaikin & Karp, P.C., Rockville, MD, argued (Paul B. Tierney, on brief), for plaintiffs-appellants.

David Ira Salem, Asst. U.S. Atty., Baltimore, MD, argued (Richard D. Bennett, U.S. Atty., Roann Nichols, Asst. U.S. Atty., on brief), for defendant-appellee.

Before WIDENER and WILKINSON, Circuit Judges and SHEDD, United States District Judge for the District of South Carolina, sitting by designation.

## OPINION

WIDENER, Circuit Judge:

This appeal requires us to examine the scope of the discretionary function exception to the limited waiver of sovereign immunity provided for in the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (FTCA or the Act). Appellants Price A. Baum and Margaret Leedy were injured in an automobile accident in which their vehicle penetrated a guardrail on a bridge over the Baltimore–Washington Parkway, causing them to fall to the roadway below. The bridge and guardrail system was owned and maintained by the United States Department of Interior, National Park Service. Baum and Leedy brought suit against the United States pursuant to the FTCA, claiming negligence in the design, construction, and maintenance of the guardrail system in question. The district court dismissed the action on the government's motion, holding that all of the gov-

ernment actions complained of were inherently ones involving choice and policy considerations, and thus fell within the discretionary function exception to the FTCA. *Baum v. United States*, 765 F.Supp. 268 (D.Md.1991). Finding no error, we affirm.

I

The accident giving rise to the instant action occurred on May 24, 1987, when Baum was driving his van on eastbound Maryland Route 198 in Anne Arundel County, Maryland, approaching the Fort Meade Road Bridge, which carries Route 198 over the Baltimore–Washington Parkway. Leedy was a passenger in Baum's van. In their complaints Baum and Leedy allege that a vehicle being driven westbound on Route 198 by one Michael Massey crossed into the eastbound lane on or near the bridge and collided with the driver's side of Baum's van. Following the collision, the Baum vehicle caromed off the south side of the road and ran into a curved stone bridge approach adjacent to the eastbound lanes. That collision, in turn, caused the van to rebound across the eastbound and westbound lanes of the bridge on Route 198. There the van went over a curb, crossed a sidewalk, and hit a steel * bridge rail mounted on cast iron * bridge posts.* The guardrail gave way upon impact and the van fell 22 feet to the southbound lanes of the Baltimore–Washington parkway.

On January 31, 1990, Baum filed a one-count complaint under the FTCA in the United States District Court for the District of Maryland against the United States claiming that his injuries were the result of the negligence of the National Park Service, National Capital Region, in designing, constructing, and maintaining the guardrail system in place on the Fort Meade Road Bridge at the time of the accident. Leedy filed a similar suit against the United States on March 19, 1990. The cases were consolidated and the government moved for dismissal or, in the alternative, sum-

---

* The affidavit of David R. Schelling, filed by plaintiffs, describes the metals of which the posts and rail were made. The complaints did not refer to the posts at all and described the rail only as "metal".

See Note 2, *infra*.

mary judgment on the grounds that the actions of the government with respect to the guardrail fell within the discretionary function exception to the FTCA and that the negligence action was thus barred by sovereign immunity. On May 23, 1991 the district court granted the government's motion and dismissed the case. Baum and Leedy now appeal from that dismissal.[1]

## II

## A

The FTCA waives the sovereign immunity of the United States so that the government may be liable in tort "in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or punitive damages." 28 U.S.C. § 2674. This broad waiver of immunity is tempered by a rather extensive list of exceptions found at 28 U.S.C. § 2680. The instant case involves one of the more important, and certainly one of the most often-contested, exceptions, the discretionary function exception of 28 U.S.C. § 2680(a). That exception provides that the FTCA's waiver of the federal immunity "shall not apply to—[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency

or an employee of the Government, whether or not the discretion be abused."

The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984). The Supreme Court has further identified the purpose of the exception as follows:

Congress wished to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. By fashioning an exception for discretionary governmental functions, including regulatory activities, Congress took "steps to protect the Government from liability that would seriously handicap efficient government operations."

*Varig Airlines*, 467 U.S. at 814, 104 S.Ct. at 2765 (quoting *United States v. Muniz*, 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963)).

Though the purpose underlying the discretionary function exception is well accepted, courts have encountered some difficulty in applying its rather general terms

---

**1.** The government filed a "Motion to Dismiss, or in the Alternative, for Summary Judgment." In opposition thereto, the plaintiff filed an "Opposition to Defendant United States' Motion to Dismiss, or in the Alternative, for Summary Judgment." The motion of the United States was accompanied by an affidavit, and the opposition of the plaintiffs was accompanied by an affidavit and other papers, all containing particular facts not in the pleadings. The order of the district court dismissing the case took the parties at their word and granted the United States' "Motion to Dismiss, or in the Alternative, for Summary Judgment." On review, the government now says that the standard should be that of a review of the granting of a motion for summary judgment, while the plaintiff takes the position that the standard should be that of review of a dismissal.

We think the standard to be used is a matter of indifference, and we do not decide the question. We have examined the briefs with some care and note that nowhere in the briefs do the parties take exception to any of the facts relied upon by the district court in its opinion. (We

do not include the assertion by the plaintiffs that the district court erred when it said they relied upon the use of design and material they claimed was inferior. This statement is so far from accurate that we discount it completely.) So the facts are undisputed, whether they have been brought to the attention of the district court and of this court by way of the complaints or by way of affidavit or accompanying papers. That being true, it is a matter of law in either instance that we decide.

For convenience of the reader, we have marked with an asterisk each fact referred to in this opinion which is not disclosed in the complaints filed by Baum and Leedy. If any asserted fact has been contested, we have not used it as a fact on which this opinion is based.

The effect of all of this is that we consider the case in a posture not unlike the older practice in the federal courts of hearing some equity cases on bill and answer, which is yet available in the state courts. See *Sands's Suit in Equity*, 2d Ed., § 325; *Lile's Equity Pleading and Practice*, 3rd Ed., § 222.

to the myriad of fact patterns that predictably present themselves as litigants attempt to measure governmental conduct by the measuring stick of state tort law. See generally L. Jayson, *Handling Federal Tort Claims* § 248.01 (1992). The statute itself makes no attempt to define what governmental functions are to be deemed discretionary and thus outside the scope of the waiver. Moreover, until recently the Supreme Court, as well as this court, found it unnecessary to define with precision when the discretion ends in deciding questions involving the exception. See, e.g., *Dalehite v. United States*, 346 U.S. 15, 35, 73 S.Ct. 956, 967–68, 97 L.Ed. 1427 (1953); *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764; *Patterson v. United States*, 856 F.2d 670 (4th Cir.1988), vacated en banc, 881 F.2d 127 (4th Cir.1989).

■ However, the law defining what governmental functions are discretionary for purposes of the exception has been clarified by two recent decisions of the Supreme Court. In *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), and *United States v. Gaubert*, —— U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (U.S.1991), the Court settled upon and then clarified a two-tier analysis for identifying discretionary functions. When evaluating a claim under the FTCA, we must ask first whether the governmental action complained of "involves an element of judgment or choice." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958; *Gaubert*, —— U.S. ——, 111 S.Ct. at 1273; see also *Piechowicz v. United States*, 885 F.2d 1207, 1211 (4th Cir.1989). The inquiry boils down to whether the government conduct is the subject of any mandatory federal statute, regulation, or policy prescribing a specific course of action. If such a mandatory statute, regulation, or policy applies, then the conduct involves no legitimate element of judgment or choice and the function in question cannot be said to be discretionary. In that case the government actor "has no rightful option but to adhere to the directive," and if the plaintiff can show that the actor in fact failed to so adhere to a mandatory standard, then the claim does not fall within the discretionary function exception. *Berkovitz*, 486 U.S. at 530, 108 S.Ct. at 1953–54.

■ If no such mandatory statute, regulation, or policy applies to remove the challenged conduct from the choice and judgment of the government, then we move to the second tier of the *Berkovitz–Gaubert* analysis and ask whether the choice or judgment involved is one "based on considerations of public policy." *Berkovitz*, 486 U.S. at 531, 108 S.Ct. at 1954–55; *Gaubert*, —— U.S. at ——, 111 S.Ct. at 1274. This requirement is consistent with and mandated by the general purpose underlying the FTCA and the discretionary function exception, *i.e.*, to balance Congress' desire to allow redress of injuries suffered through the negligence of government actors against the need to protect the government from being hobbled in the discharge of its policy-driven duties by tort suits. In *Gaubert*, the Court provided an illustration of the operation of this requirement that we think particularly helpful in its application:

> There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

*Gaubert*, —— U.S. at —— n. 7, 111 S.Ct. at 1275 n. 7.

Finally, we note one further point with respect to the application of the second element of the foregoing analysis that we believe *Gaubert* clarified. Rather than requiring a fact-based inquiry into the circumstances surrounding the government actor's exercise of a particular discretionary function, we are of opinion that a re-

viewing court in the usual case is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy. To quote the Court:

When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Gaubert,* —— U.S. at —— – ——, 111 S.Ct. at 1274–75.

■ Consistent with the objective approach to evaluation of whether a particular discretionary act is grounded in policy considerations is the well-established presumption that public officials have properly discharged their official duties. See, e.g., *United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926). Under this presumption and the teaching of *Gaubert,* we will not assume that government agents, in undertaking actions of the type normally thought to involve policy choices, in a particular case acted arbitrarily or on whim, disregarding those essential policy questions. Thus, our inquiry here must focus on the inherent, objective nature of the challenged decision; we find largely irrelevant the presence or absence of evidence that involved government agents which did or did not engage in a deliberative process before exercising their judgment.

### B

Having described the analysis under which issues involving the discretionary function exception are to be decided, we now turn to the claims of Baum and Leedy in the instant case. As the district court noted, Baum and Leedy's claims can be broken down for purposes of analysis into two distinct, though related, arguments. Even if unnecessary, we preserve it here for purposes of clarity. First, Baum and Leedy argue that the National Park Service was negligent in designing and constructing the bridge guardrail in question in that cast iron, rather than cast steel, was used to construct the posts holding the steel bridge rail. The National Park Service constructed the bridge in the early 1950's. Second, they claim the Park Service negligently failed to maintain the guardrail system during the time preceding their accident. We address separately the two types of claims.

### 1

As to the design and construction claim, we first ask whether, during the relevant period, any mandatory statute, regulation, or policy governed the Park Service's design and construction of this guardrail system. More specifically, Baum and Leedy's only real allegation of negligence appears to be that the selection of cast iron as the material for the guardrail posts fell below an objective standard of reasonableness; thus we inquire whether any law or official policy of that period mandated the exclusive use of cast steel in such projects.

■ Baum and Leedy strive mightily to find in the legislation authorizing construction of the Baltimore–Washington Parkway a specific Congressional mandate from which the Park Service deviated in constructing the guardrail as it did. They suggest that the following portion of that legislation constitutes such a mandate:

The [Baltimore–Washington] parkway shall be constructed, developed, operated, and administered as a limited access road primarily to provide a protected, safe, and suitable approach for passenger-vehicle traffic to the National Capital and for additional means of access between the several Federal establishments adjacent thereto and the seat of govern-

ment in the District of Columbia. To avoid impairment of that purpose, the Secretary of the Interior, with the concurrence of the Secretary of Commerce, shall control the location, limit the number of access points, and regulate the use of said parkway by various classes or types of vehicles or traffic.

Pub.L. No. 81–643, § 2, 64 Stat. 400, 401 (1950). We are of opinion that this very general, sweeping language is insufficient to remove questions of design and construction of guardrails on the parkway from the discretion of the National Park Service. Baum and Leedy simply read too much into this language when they argue that the direction "to provide a ... safe[ ] and suitable approach for passenger-vehicle traffic" constitutes a mandatory statute, regulation, or policy within the meaning of *Gaubert* and *Berkovitz*. Surely such language cannot be interpreted as removing all safety-related decisions from the discretion of the agency administering the project.[2]

■ Finding no mandatory law governing the design and construction of the parkway guardrails, we turn to the second element of the *Berkovitz–Gaubert* analysis: whether the choice of materials to be used in the guardrails is a choice of the type that normally involves considerations of public policy. The question of what materials to use in such a project is also fundamentally described as a question of how to allocate limited resources among competing needs.

Considered in this light, we are of opinion that the Park Service's decision in this regard plainly was one bound up in economic and political policy considerations. As the Court has stated in the related context of a regulatory agency, "[w]here Congress has delegated the authority ... to the executive branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning-level decisions establishing programs are protected by the discretionary function exception." *Gaubert*, —— U.S. at ——, 111 S.Ct. at 1274. We think this idea equally applicable to the actions of an agency charged with administering a public works project, and we find the design and construction decisions in this case to be just the kind of planning-level decisions of which the Court spoke in *Gaubert*. See also *Bowman v. United States*, 820 F.2d 1393 (4th Cir.1987); *Miller v. United States*, 710 F.2d 656 (10th Cir.), cert. denied, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983). Accordingly, we concur with the district court's dismissal of the claims related to design and construction.

2

■ Next we turn to Baum and Leedy's argument that the Park Service negligently maintained the guardrail system in the years preceding their accident. As with our first line of inquiry under *Berkovitz* and *Gaubert*, we find no mandatory statute, regulation, or policy governing the

---

**2.** Baum and Leedy also direct the court's attention to a work known as the Standard Specifications for Highway Bridges (5th ed. 1949),** which they represent was adopted by the American Association of State Highway Officials, apparently as an official source of construction specifications or guidelines. Specifically, they quote the following section:

Substantial railings along each side of the bridge shall be provided for the protection of traffic. Consideration shall be given to the architectural features of the railing to obtain proper proportioning of its various members and harmony with the structure as a whole. Consideration shall also be given to avoiding, as far as consistent with safety and appearance, obstruction of the view from passing vehicles.

Baum and Leedy appear to cite this material primarily to show negligence on the part of the

Park Service, a showing that is largely irrelevant to the discretionary function inquiry. We pause here only to note that these standards are insufficient to remove design or construction decisions from the discretion of the government. Despite the district court's suggestion that these specifications governed construction of the bridge in question, Baum and Leedy cite no authority, and we are aware of none, adopting these standards as binding on the United States at that time. Even if the standards had been so adopted, however, the above-quoted language relating to railings is far too general to serve as a mandatory regulation governing the choice of guardrail post materials under the *Berkovitz–Gaubert* analysis.

** Filed by plaintiffs with their response to the motion of the government to dismiss, or alternately for summary judgment.

Park Service's maintenance of bridges or guardrails on park property; thus maintenance, like design and construction, is a function subject to the judgment of the Park Service. The only remaining question, then, is whether Park Service judgments involving when and how to maintain its bridges and guardrails are of the type normally involving considerations of economic, social, or political policy.

Here we begin by examining exactly what Baum and Leedy contend that the Park Service should have done in the way of "maintenance" of the guardrail system in this case. As we have described, the allegedly defective guardrail system was comprised of a steel guardrail supported by cast iron posts. Despite Baum and Leedy's allegation of negligence in what they call the "maintenance" of the guardrail system, nowhere have they suggested that the allegedly defective condition of the guardrail system could have been remedied by any action short of outright *replacement* of the cast iron posts. Indeed, Baum and Leedy appear not to dispute the government's assertion that the only act of maintenance that could have put the guardrail in compliance with current engineering standards is outright replacement.[3]

As authority for their argument that the government's alleged negligence in maintaining, or failing to replace, the cast iron guardrail posts, Baum and Leedy rely primarily on two cases: *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), and *ARA Leisure Services v. United States*, 831 F.2d 193 (9th Cir.1987). We find both cases inapposite. In *Indian Towing*, the Court held actionable under the FTCA the alleged negligence of the United States Coast Guard in failing properly to maintain the beacon of a lighthouse, among other things it had failed to repair the light or give warning that the light was not operating. Because the government conceded that the maintenance of the lighthouse did not fall within the discretionary function exception, the opinion of the Court does not discuss that

aspect of the FTCA. Rather, the government made a rather ill-defined and, ultimately, unsuccessful argument that the maintenance of a lighthouse was not the proper basis for liability in tort because it was a "uniquely government function." For this reason, subsequent decisions of the Court have all but disavowed *Indian Towing* as authority relevant to the discretionary function exception, and we likewise find it inapplicable to the instant case. See *Varig Airlines*, 467 U.S. at 812, 104 S.Ct. at 2763–64; *Gaubert*, —— U.S. at —— ——, 111 S.Ct. at 1273–74.

The case of *ARA Leisure Services* arose out of an accident in which a tour bus operated by the plaintiff went off a badly-eroded stretch of road in a national park, killing and injuring many passengers. The tour company sought damages under the FTCA on the grounds that the Park Service negligently designed, constructed, and maintained the road in question. The district court entered summary judgment in favor of the government, holding that the deficient condition of the road was due to policy-based decisions with respect to design, construction, and maintenance, and that those decisions thus fell within the discretionary function exception to the FTCA.

The Ninth Circuit reversed in part. While the court agreed with the district court's holding that judgments related to the design and construction of the road were discretionary functions, the court held that the Park Service's failure to maintain the road was not a matter of discretion and was thus actionable under the FTCA. While the case is superficially analogous to the one at bar, a factor in *ARA Leisure* makes that case distinguishable. The apparent cause of the accident in that case was erosion of the park roadway from an original width of 28 feet to a width of 14.8 feet at the accident site, combined with unacceptably soft roadway edges. In holding that the decision not to repair the erosion was outside the discretionary function

---

**3.** There is no suggestion of deterioration of the posts, the argument goes that they should not have been used in the first place. Thus, there is really no question as to maintenance, the fault, if any, was in design and construction.

exception, the court found that there was "evidence in the record that Park Service standards explicitly required that park roads 'conform to the original grades and alignments' and that graded roads be 'firm, [and] of uniform cross section.'" *ARA Leisure*, 831 F.2d at 195. Thus, the Park Service's actions in that case failed the first element of the *Berkovitz–Gaubert* analysis: there existed mandatory regulations compelling the Park Service to act, and those regulations were not met. As we have noted, no such mandatory law or regulation governed the Park Service's actions in the present case; thus, our decision today is not inconsistent with that portion of the *ARA Leisure* case.

In light of the nature of Baum and Leedy's maintenance argument, we are of opinion that the Park Service's judgment in this regard falls as squarely within the discretionary function exception as do its decisions with respect to design and construction. The decision of how and when to replace a major element of a substantial public facility is, like the decisions involving design and construction, at bottom a question of how best to allocate resources. Such a decision is inherently bound up in considerations of economic and political policy, and accordingly is precisely the type of governmental decision that Congress intended to insulate from judicial second guessing through tort actions for damages. While we do not suggest that every maintenance decision of every government actor is so policy-based as to fall within the discretionary function exception, on the facts of this case we should reach no other result.

The judgment of the district court is accordingly

*AFFIRMED.*

SHEDD, District Judge, concurring:

The application of the discretionary function exception to the Federal Tort Claims Act is a very difficult area of the law. This exception is not defined in the statute and courts have struggled with applying the exception to unlimited factual circumstances.

The purpose of the discretionary function exception can be stated easily enough. It was enacted to protect against judicial second-guessing of policy judgments, which are those decisions grounded in social, economic, and political policy. However, Justice Scalia is undoubtedly correct when he says lower courts have had difficulty in applying the test of whether the choice is an exercise of "policy judgment." *United States v. Gaubert*, —— U.S. —— – ——, 111 S.Ct. 1267, 1280 (1991).

This Court today rules that the judgment involved in choosing the materials for the construction of a bridge guardrail is a policy judgment, exempted from judicial scrutiny by the discretionary function exception. Under this analysis, a person injured as a result of the government's defective design or construction of any infrastructure will be unable to recover against the government, unless there was a breach of a specific safety standard mandated by a federal statute or regulation. As a result, government agencies may well be discouraged from enacting mandatory regulations governing the design and construction of infrastructure in order to claim immunity under the umbrella of the discretionary function exception.

Although I believe the concurrence by Justice Scalia in *Gaubert* presents a more appropriate framework for analyzing the discretionary function exception, I agree that this Court has correctly applied the analysis set forth in *Gaubert.* Therefore, I concur with the results reached in this case.