Carl L. SMITH, et al.,

v.

UNITED STATES of America.

No. CIV.A. DKC 2001–2131.

United States District Court,
D. Maryland.

March 5, 2003.

Nadira Clarke, Office of the United States Attorney, Baltimore, MD, Peter F. Frost, United States Department of Justice, Aviation and Admiralty Litigation, Washington, DC, for defendant.

Allan A. Noble, Budow and Noble PC, Bethesda, MD, for plaintiff.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this admiralty tort action brought under the Public Vessels Act, 46 U.S.C. § 781 *et seq.*, and the Suits in Admiralty Act (SAA), 46 U.S.C. § 741 *et seq.*, is Defendant United States of America's Motion for Summary Judgment. The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6. For the reasons that follow, the court will dismiss the complaint.

## I. Background

The following facts are alleged by Plaintiffs Carl L. Smith and Ace American Insurance Co. (Ace). On the morning of July 31, 1999, Plaintiff Smith was operating his 31 foot Mainship vessel, the "Lady Bridgette," in the waters of Herring Bay. Smith's young son was in the boat with him. Some time around 6:30 p.m. that day, the "Lady Bridgette" suddenly and without warning ran upon the submerged steel piling of Herring Bay Daybeacon 3 [1] (Daybeacon 3). The striking of the submerged steel piling of Daybeacon 3 caused serious damage to the vessel and serious personal injuries to Smith.

At the time of the striking of the submerged steel piling, there was nothing visible to warn boaters like Plaintiff Smith that there was an underwater obstruction where the missing daybeacon should have been located. The United States Coast Guard (Coast Guard) was responsible for the maintenance of the daybeacon. Prior to the striking of the submerged steel piling by Smith, the Coast Guard had been advised that the daybeacon was not present in its location and that its structure was missing. The Coast Guard was aware of the missing daybeacon and failed to take proper action to locate, replace, or re-mark the daybeacon. While a Coast Guard vessel was sent from Annapolis to look for the missing daybeacon, the vessel failed to locate or re-mark it.

---

1. Herring Bay Daybeacon 3 is a fixed aid to navigation, comprised of a set of "dayboards"—signs marked with the number "3"—mounted on a steel piling, set in the bay bottom and projecting several feet above the waterline.

The Coast Guard is the governmental agency responsible for the maintenance and replacement of aids to navigation like the Herring Bay Daybeacon 3. Plaintiffs allege that the Coast Guard failed to use reasonable care in locating, replacing, and re-marking Daybeacon 3 after being advised that it was missing; the Coast Guard breached its duty owed to Plaintiffs when it negligently undertook to locate and negligently failed to mark, replace, and remove the submerged daybeacon; and the Coast Guard breached its duty to Plaintiffs promptly and properly to warn boaters like Smith of the missing daybeacon and to remove the remains of the Daybeacon 3, which constituted a dangerous submerged obstruction. Plaintiffs further allege that the striking of the submerged daybeacon by Smith's vessel and his personal injuries were proximately caused by the negligence of the Defendant, United States of America, acting through and by the U.S. Coast Guard. Once Defendant undertook to locate and replace the daybeacon, it was obligated to use reasonable care to locate and mark the missing daybeacon and to notify boaters of the missing aid to navigation. Defendant failed to use such reasonable care.

Plaintiffs filed their complaint in this court on July 20, 2001. Plaintiff Smith seeks damages in the sum of $200,000 for injuries sustained to his neck, back, knees, and right ankle and $47,478 for damages sustained to his vessel consisting of repair costs, salvage costs, and towage charges. Ace, as the subrogated underwriter for Smith, claims that it is entitled to recover those sums paid in accordance with the applicable policy of the insured. Defen-

dant brought its motion for summary judgment pursuant to Fed.R.Civ.P. 56 on May 16, 2002.

## II. Standard of Review

■ Although Defendant has brought its motion as one for summary judgment, it argues that the "discretionary function exception" applies to limit the SAA's waiver of sovereign immunity and bars Plaintiffs' suit. Federal courts have consistently held that they lack subject matter jurisdiction if the discretionary function exception bars suit. *Williams v. United States*, 50 F.3d 299, 305 (4th Cir. 1995). Defendant's motion is therefore more properly brought as one to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1).[2]

In a Rule 12(b)(1) motion where the existence of the court's subject matter jurisdiction is at issue, the court may "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir.1993) (citations omitted). *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). It is the plaintiff's burden to prove that jurisdiction in this court is proper. *See DeBauche v. Virginia Commonwealth Univ.*, 7 F.Supp.2d 718, 721 (E.D.Va.1998). The court must presume that all factual allegations in the complaint are true and make all reasonable inferences in the plaintiff's favor. *Id.*

## III. Analysis

Plaintiffs and Defendant agree that the central issue in this case is whether the

---

**2.** Although Defendant did not raise the jurisdictional issue, the Supreme Court has held that a party cannot waive the defect of lack of subject matter jurisdiction or consent to jurisdiction where it is lacking. *Wisconsin Dep't of Corrections v. Schacht*, 524 U.S. 381, 389,

118 S.Ct. 2047, 2052, 141 L.Ed.2d 364 (1998) (citations omitted). Furthermore, "[n]o court can ignore the defect; rather a court, noticing the defect, must raise the matter on its own." *Id.*

Coast Guard "should have marked or re-placed [Daybeacon 3] sooner than they did." *See* Paper 11, at 6; Paper 14, at 1. Plaintiffs also maintain that Defendant breached its duty promptly and properly to warn boaters like Plaintiff Smith of the missing daybeacon.

The following additional facts are un-controverted in affidavits and deposition testimony. On the morning of July 31, 1999, the Coast Guard Activities Baltimore (Activities Baltimore) received a report that Herring Bay Daybeacon 3 was miss-ing its dayboards. After learning of this discrepancy, Activities Baltimore: issued a Broadcast Notice to Mariners [3] at approxi-mately 9:50 a.m. reporting that Daybeacon 3 was missing its dayboards and notified Aids to Navigation Team (ANT) Sledge [4] of the discrepancy. At roughly the same time, Boatswain's Mate Third Class Jo-seph S. Gary was sent in a small boat from Coast Guard Station Annapolis (Station Annapolis) to investigate the report of the missing dayboards. Petty Officer Gary was unable to locate Daybeacon 3 at all in Herring Bay and at approximately 10:30 a.m., he reported to Station Annapolis that the entire structure of the daybeacon was missing. Station Annapolis then immedi-ately reported that the entire daybeacon was missing (both dayboards and struc-ture) to the SAR Mission Coordinator (SMC) at Activities Baltimore. The SMC at Activities Baltimore claims, however, that it did not become aware that the entire structure of the daybeacon was missing until after Plaintiff's boat hit the daybeacon's steel piling. Slightly before Station Annapolis reported the missing

daybeacon therefore, at approximately 10:10 a.m., Activities Baltimore notified ANT Sledge of the missing dayboards only; the SMC at Activities Baltimore nev-er advised ANT Sledge or Chief Arthur B. Ford, Jr. (Chief Ford), the Coast Guard Officer in charge of ANT Baltimore on July 31, 1999, that the entire daybeacon structure was missing.

At approximately 6:30 p.m. of the same day, July 31, 1999, Plaintiff Smith's vessel struck the submerged remains of Daybea-con 3. Some time after this accident oc-curred, Activities Baltimore issued a sec-ond Broadcast Notice to Mariners revising the warning for Herring Bay and notifying that dayboards and support structure for Daybeacon 3 were destroyed and missing and that the remaining structure may pose an additional hazard. At approximately 12:45 a.m., August 1, 1999, ANT Sledge placed a temporary lighted buoy to mark the position of the submerged piling of Daybeacon 3. Activities Baltimore then is-sued a third Broadcast Notice to Mariners warning that Daybeacon 3's dayboards and supporting structures were destroyed and missing and noting the position of the tem-porary lighted buoy.

Defendant argues that marking and/or replacing a missing aid to navigation like Daybeacon 3 or warning about faults are "discretionary functions" for which the United States government and its adminis-trative agencies cannot be liable. The Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), authorizes suits against the United States for damages caused by the negligent or wrongful acts or omissions of those acting within the scope of govern-ment office or employment. One impor-tant exception to this waiver of sovereign

---

**3.** The Notice to Mariners system is the United States government's method of notifying mar-iners of changes to their charts. Notices to Mariners can be printed or broadcast, or both.

**4.** ANT Sledge is based in Baltimore and is the Coast Guard command generally responsible for maintaining the aids to navigation in a geographic area under the cognizance of Ac-tivities Baltimore.

immunity, however, is the "discretionary function exception" contained at 28. U.S.C. § 2680(a), which provides that no liability shall lie for any claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the party of a federal agency or an employee of the Government, whether or not the discretion involved be abused." According to the Supreme Court, this exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988) (quoting *United States v. Varig Airlines,* 467 U.S. 797, 808, 104 S.Ct. 2755, 2761–62, 81 L.Ed.2d 660, (1984)).

Plaintiffs have brought their action against the United States pursuant to the Suits in Admiralty Act (SAA), 46 U.S.C. § 741 *et. seq.,* however, and not the FTCA. The SAA does not contain the explicit discretionary function exception that the FTCA does. Nevertheless, in *Tiffany v. United States,* 931 F.2d 271 (4th Cir.1991), the Fourth Circuit confirmed an implied discretionary function exception in the SAA, observing that "[e]ach circuit that has considered the matter has concluded that actions brought under the SAA which would require the court to re-examine discretionary acts taken by the government must be dismissed." *Id.,* at 277 (citations omitted). This conclusion is derived from the same respect for separation of powers on which the FTCA exception is founded— i.e., the desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz,* 486 U.S., at

537–37, 108 S.Ct., at 1959 (quoting *Varig Airlines,* 467 U.S., at 814, 104 S.Ct., at 2764–65).

■ As the Fourth Circuit explained in *Baum v. United States,* 986 F.2d 716 (4th Cir.1993), the law defining what constitutes a protected discretionary function of the government was clarified by a two-part test in *Berkovitz* and *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991):(1) does the challenged governmental conduct involve an element of judgment or choice; and (2) if so, is that judgment or choice one based on considerations of social, economic, or political policy? *See Baum,* 986 F.2d at 720 and 723; *see also Minns v. United States,* 155 F.3d 445, 451 (4th Cir.1998). The question therefore is whether the challenged conduct of the Coast Guard in the instant case satisfies this two-part test and is thereby insulated from Plaintiffs' suit.

■ Plaintiffs challenge two aspects of the Coast Guard's conduct: (1) the Coast Guard's failure to replace or mark Daybeacon 3 immediately or sooner than it did, and (2) the Coast Guard's failure to warn mariners sooner that Daybeacon 3 was missing its support structure in addition to its dayboards. *See* Paper 1, ¶¶ 15–16. As will be seen, the Coast Guard's conduct as to both issues involved an element of judgment and that judgment was policy-based.

Defendant notes that due to resource limitations in manpower and funding, the Coast Guard cannot and does not respond immediately to correct all reported discrepancies to navigational aids. To ensure that Coast Guard assets are utilized most effectively, the Coast Guard developed the Discrepancy Response Decision Guide, which helps determine the relative significance of an aid discrepancy and the appropriate response level for corrective action.[5]

---

5. The possible Discrepancy Response Levels are Immediate (calling for corrective action,

weather and resources permitting, immedi-

The first step in navigational aid discrepancy response is to assign a numerical "weight" to the aid in question that stands for its relative significance in the larger picture of the system of navigational aids. The discrepancy reported with respect to the aid in question is then assigned another weight that stands for how critical the discrepancy is. The two weights are then multiplied to arrive at the Discrepancy Response Factor which determines what response level is appropriate for correcting the discrepancy.

In this case, ANT Sledge was responsible for determining the relative significance of Daybeacon 3. Taking into account Daybeacon 3's characteristics and using the Discrepancy Response Decision Guide, a relatively low weight of 25 was assigned to Daybeacon 3. Next, based on the report that Daybeacon 3 was only missing its dayboards, Chief Ford, again using the Discrepancy Response Decision Guide, determined that the response level for this discrepancy was low and that corrective action could be deferred to an appropriate opportunity. Because he had resources available to correct the discrepancy sooner, however, Chief Ford decided to correct it the next morning, within 24 hours of the first report of the discrepancy.

Whether a governmental action involves an element of judgment or choice,

> boils down to [an inquiry of] whether the government conduct is the subject of any mandatory federal statute, regulation, or policy prescribing a specific course of action. If such a mandatory statute, regulation, or policy applies, then the conduct involves no legitimate element of judgment or choice and the function in question cannot be said to be discretionary.

*Baum*, 986 F.2d at 720. Defendant notes that the Discrepancy Response Decision Guide, as a part of the internal regulations of the Coast Guard (contained in the Coast Guard's Aids to Navigation Manual) that are distinct from federal regulations having the force of law, do not prescribe a specific course of action. The guidelines indicate only the priority for corrective action to be assigned to a given discrepancy; they leave decisions about what the corrective action will be, the actual method of correction (i.e., permanent or temporary measures), and, to the extent that the guidelines recognize that weather or resource constraints may preclude correction within the listed time periods, the timing of the corrective action, to the discretion of the decision-maker. The court therefore finds an element of judgment or choice to be present in the Coast Guard's conduct regarding the replacing or marking of missing Daybeacon 3. As the Coast Guard's "Aids to Navigation Manual" states, "[i]t is [ ] the responsibility of the commanding officer to determine the most efficient response to the discrepancy." Paper 11, Att. 5 at 5.

The next step is to analyze that judgment or choice of the Coast Guard to determine whether it was based on considerations of public policy. A decision that takes into account the question of how to allocate limited resources among competing needs is one that is "bound up in economic and political policy considerations." *Baum*, 986 F.2d at 722. Chief Ford's pre-accident decision to attend to the Daybeacon 3 discrepancy on the morning of August 1, 1999, took into account such economic and political policy considerations. The Coast Guard's "Aids to Navigation Manual" explains that the Dis-

ately), High Priority (within 18 hours), Priority (within 36 hours), Routine (within 72 hours), and Decision Deferred (when action can be scheduled in the normal course of events). Paper 11, at 4; *see also* Paper 11, Att. 1 at 12–35.

crepancy Response guidelines were developed because the old policy of responding to any and all aid discrepancies within two hours was "not cost effective and [ ] placed an undue hardship on personnel." Paper 11, Att. 5, at 4. Defendant asserts that Chief Ford decided to respond to the Daybeacon 3 discrepancy on the morning of August 1, 1999 after considering the fact that he had resources available to correct the discrepancy sooner than the guidelines' indicated response deadline. Paper 11, at 5. Plaintiffs do not proffer any evidence to call this assertion into question. To the extent that Chief Ford's decision accounted for the allocation of resources among competing needs, therefore, the Coast Guard's response to the Daybeacon 3 discrepancy is insulated from Plaintiffs' tort suit.

Plaintiffs also complain, however, that Chief Ford failed to take into account the fact that Daybeacon 3's entire structure was missing when he originally decided that corrective action should be taken on the morning of August 1, 1999. It is much harder to characterize this failure as a product of a policy consideration; Chief Ford did not *choose* to ignore or discount this fact when making his decision. Instead, Chief Ford, as the relevant decisionmaker, simply failed to take into account the fact that Daybeacon 3 was entirely missing from its set location even though this fact had been observed by Coast Guard personnel and reported to Annapolis Station and SMC Activities Baltimore that morning (even if SMC Activities Baltimore claims it did not receive or did not remember receiving the report).

In *Berkovitz,* the petitioners alleged that a division of the National Institutes of Health issued a product license without first receiving data showing how the product in question matched up against regulatory safety standards. The Court found that the discretionary function exception did not bar a cause of action based on this allegation because a statute and regulation required the receipt of test data as a precondition to licensing. *Berkovitz,* 486 U.S. at 542, 108 S.Ct. at 1962. Here, however, Plaintiffs have failed to show the existence of a comparable statute, regulation, or other authority requiring Defendant to take into account all available facts when making a decision regarding the timing of a daybeacon discrepancy correction. The court finds that the discretionary function exception extends to the entirety of Defendant's challenged conduct with regard to the marking and replacing of Daybeacon 3 and Defendant's motion for summary judgment on this claim will be granted.

Plaintiffs also claim that Defendant negligently failed properly and promptly to warn mariners of the danger posed by Daybeacon 3 and that the striking of the submerged daybeacon by Plaintiff Smith's vessel as well as his personal injuries were proximately caused by this negligence. Plaintiffs allege that the Notice to Mariners issued by the Coast Guard on the morning of July 31, 1999 warning that Daybeacon 3's dayboards were missing was not corrected to reflect that the entire daybeacon structure was missing until after Plaintiff Smith's vessel had struck the submerged pile around 6:30 p.m. that same day.

■ The same discretionary function exception applies to this claim and precludes the court from asserting jurisdiction over it. Even if it did not, however, Plaintiffs' claim would fail. Defendant argues that Plaintiffs' allegations are irrelevant because the Coast Guard's allegedly faulty Notices to Mariners did not proximately cause Plaintiff Smith's injuries; in fact, Defendant presents Plaintiff Smith's deposition testimony in which he admits that he did not rely on the Notices to Mariners, did not know what they were, and did not

recall using his VHF radio on board his boat to listen to Coast Guard broadcasts. In the absence of evidence proffered or forecasted by Plaintiffs to support the contention that the allegedly faulty Notices to Mariners proximately caused or even affected Plaintiff Smith's marine activities on July 31, 1999, Defendant's motion for summary judgment with respect to Plaintiffs' claim for negligent failure promptly and properly to warn would be granted, even if the court had jurisdiction.

## IV. Conclusion

For the foregoing reasons, the complaint will be dismissed. A separate order will follow.