**STONE CRANBERRY CORP., Plaintiff**

v.

**FOSTER–MILLER, INC., Northrop, Grumman Space & Mission Systems Corp. and United States of America, Defendants.**

**No. CIV.A. 02–11206–EFH.**

United States District Court, D. Massachusetts.

Jan. 18, 2006.

Steven J. Marullo, Law Office of Steven J. Marullo, Steven Rosenberg, Boston, MA, for Stone Cranberry. Corporation Plaintiff.

Anton P. Giedt, United States Attorney's Office, Boston, John F. McCarthy, U.S. Department of Justice, Environmental Defense Section, Washington, DC,

Christine K. Tramontana, Giarrusso, Norton, Cooley & McGlone, Marina Bay, Joseph Lawrence Harrington, III, Giarrusso, Norton, Cooley & McGlone, P.C., Marina Bay, Roy P. Giarrusso, Giarrusso, Norton, Cooley & McGlone, P.C., Curtis A. Connors, Giarrusso, Norton, Cooley & McGlone, P.C., Quincy, MA, for Air Force, United States Department of the, Northrop Grumman Space & Mission Systems Corp., Foster–Miller, Inc., Defendants.

Blake C. Nielsen, Environment & Natural Resources Division, Environmental Defense Section, Timothy B. Walthall, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for USA, Defendant.

## MEMORANDUM AND ORDER

HARRINGTON, Senior District Judge.

### INTRODUCTION

This matter is before the Court on the Defendant United States of America's ("United States" or "the government") Motion to Dismiss or, in the Alternative, for Summary Judgment as to the claims of the Plaintiff Stone Cranberry Corp. ("Stone Cranberry"). Stone Cranberry brings its claims against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346. The United States asserted several arguments in support of its Motion, including the so-called discretionary function, independent contractor, and misrepresentation exceptions to the FTCA, as well as Section 113(h) of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"). As is discussed in greater detail below, the discretionary function exception operates here to insulate the United States

from liability. Summary judgment is therefore granted in favor of the United States pursuant to FED. R. CIV. P. 56(c) and the United States' alternate theories need not be addressed.

### FACTUAL BACKGROUND

**I. The United States Rapid Runway Repair Program Leads to a Release of Hazardous Materials at the Ravenbrook Landfill.**

In the early 1980's, the United States Air Force ("USAF" or "Air Force") initiated a program to develop, test, and employ a quick-setting concrete to repair damaged airfield runways. This program was known as the Rapid Runway Repair Program ("RRRP"). The Air Force contracted with BDM International, Inc. ("BDM")[1] to begin a research and development program for a fast-setting crater repair material that would be usable in all weather conditions. BDM, in turn, subcontracted with various private companies, including ARNCO and Co–Defendant Foster–Miller, Inc. ("FMI"), to develop a prototype concrete for the RRRP. The concrete prototype eventually developed by the companies contained a proprietary polyurethane resin known as PERCOL. From late 1984 through 1986, FMI tested the concrete at their facilities in Saxonville, Massachusetts. Upon completion of the testing, FMI disposed of the concrete at a demolition landfill owned by Ravenbrook Farms, Inc. ("RFI") in North Carver, Massachusetts ("the Ravenbrook Landfill").[2]

Prior to its disposal at the Ravenbrook Landfill, the concrete was approved for disposal by the Massachusetts Department of Environmental Quality, now known as

1. BDM International, Inc., was the predecessor in interest to Northrop Grunman Space & Mission Systems, Corp., a Co–Defendant in this case.

2. At the time the concrete was deposited at the Ravenbrook Landfill, Edwin Whitworth, the President and sole shareholder of the Plaintiff in this case, served as President and Clerk of RFI.

12

the Department of Environmental Protection ("DEP"). After the concrete was deposited at the Ravenbrook Landfill, however, FMI discovered that the concrete did not set properly under snow and ice conditions. Specifically, these weather conditions caused the concrete to release liquid resins containing certain hazardous materials, including lead, mercury, and perchlorethylene ("PCE" or "vinyl chloride"). This tendency of the concrete to release hazardous materials under wintry conditions, PCE in particular, is the catalyst that set the wheels of this litigation in motion.

FMI hired an environmental consulting firm to investigate the likelihood of a hazardous materials release at the Ravenbrook Landfill and, in or around late 1987, it was determined that PCE had indeed leached into the landfill and groundwater thereunder. The release of PCE into the groundwater at the Ravenbrook site was determined by the DEP to be a violation of Massachusetts hazardous materials regulations. BDM, FMI, RFI, and the Air Force were all named as potentially responsible parties. In short, an environmental cleanup was necessary at the Ravenbrook Landfill.

## II. *Environmental Remediation at the Ravenbrook Landfill.*

The USAF agreed to facilitate the remediation of PCE contamination at the Ravenbrook Landfill. Massachusetts stat-

utes and regulations govern the manner in which such a task is to be performed and divide the remediation process into five phases.[3] Because Phase I had in effect already been completed, the USAF employed an engineering firm to conduct a comprehensive site assessment (Phase II), and develop a remedial action plan (Phase III). East Coast Engineering ("East Coast") performed these tasks and, in January 1995, completed a Phase II comprehensive site assessment and Phase III remedial action plan. One of the clean-up options set forth in the remedial action plan called for groundwater at the Ravenbrook site to be extracted, treated, and then replaced underground so as to bring PCE concentrations back under the appropriate levels. This remediation technique is commonly referred to as the "pump-and-treat" method. Stone Cranberry claims that the United States committed itself to facilitate a pump-and-treat remediation at the Ravenbrook Landfill. The pump-and-treat remediation never took place.

The reason a pump-and-treat remediation was never initiated at the Ravenbrook Landfill boils down to a matter of dollars and cents. The Air Force became alarmed with the mounting costs associated with East Coast's preparation of the Phase II and Phase III reports, costs that promised to escalate should a pump-and-treat remediation commence at that Ravenbrook site. As a result, the Air Force terminated their agreement[4] with RFI and discon-

**3.** Phase I consists of a review of historical data to determine whether a Phase II comprehensive assessment is necessary. Phase II comprehensive assessment entails the collection of soil, air, or ground and surface water data in order to make a risk assessment of the effect of the hazardous materials release. If the Phase II risk assessment indicates that there is a need for remediation, a Phase III remedial action plan must evaluate the alternative methods of remediation. Phase IV is the design and implementation of the chosen

remediation alternative. Phase V provides for DEP monitoring of certain long-term groundwater treatment programs. Collectively, these phases are referred to as the Massachusetts Contingency Plan ("MCP"). 310 MASS. CODE REGS. 40.0000, *et seq.*

**4.** For the purposes of this Motion, the details of the remediation agreement between the USAF and RFI are not important except to note that RFI and East Coast were primarily responsible for evaluating the contamination

tinued funding the remediation. Four years later, in 1999, the Massachusetts DEP issued a Notice of Non–Compliance to the defendants in this case and held an enforcement conference at which the contractor defendants were fined. A consent order was also issued, requiring supplemental Phase II and Phase III reports to be prepared in compliance with Massachusetts regulations. East Coast Engineering was again contracted to perform these tasks, and they completed supplemental Phase II and Phase III reports in 2001. The 2001 supplemental reports revealed that vinyl chloride contamination from the Ravenbrook site had migrated in the groundwater onto an adjacent property— property owned by the Plaintiff in this case ("the Stone Property"). At present, the groundwater at the Stone Property is being treated using a method called "monitored natural attenuation with hot spot treatment."

### III. *Plaintiff's Injury and Alleged Negligence of Defendant United States*

Edwin Whitworth purchased the Stone Property on December 31, 1997 through his company Stone Cranberry Corp., the Plaintiff in this case. Whitworth had leased the property during the previous three years, starting in July 1993. The gravamen of Plaintiff's claims against the United States is that (1) the Air Force voluntarily undertook the task of remediating groundwater contamination at the Ravenbrook site; (2) relying on this promise, Plaintiff leased and ultimately purchased the Stone Property, which is located adjacent to the Ravenbrook site; and (3) the Air Force's decision to discontinue funding for the remediation between 1995 and 1999 allowed contaminated groundwater to migrate onto the Stone Property, thereby

and various remediation options, whereas the

causing damages in the form of diminished property value.

### ANALYSIS

### A. *The Discretionary Function Exception to the FTCA*

■ The issue before the Court is whether the USAF's conduct in this case falls within the ambit of the discretionary function exception to the FTCA. The discretionary function exception insulates the United States against "[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Ascertaining whether the government may invoke this exception involves a familiar analytic framework. *Muniz–Rivera v. United States*, 326 F.3d 8, 15 (1st Cir.2003) (citing *Shansky v. United States*, 164 F.3d 688, 690–91 (1st Cir.1999)). The Court's initial task is to identify the government conduct giving rise to the claim in question. *Id.* Next, the Court must assess two interrelated questions. The first question asks whether the conduct itself is discretionary, that is, "a matter of choice for the employee [or agency]." *Bolduc v. United States*, 402 F.3d 50, 60 (1st Cir.2005) (citing *Berkovitz v. United States*, 486 U.S. 531, 537, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). This definition excludes actions prescribed by federal statute, regulation, or policy. If the Court concludes that the conduct is not a product of discretion, the analysis ends and the discretionary function exception cannot apply. *Id.* If, on the other hand, the Court concludes that the conduct in question is a product of discretion it must then move to the second question—whether the exercise of that discre-

USAF—to put it simply—was footing the bill.

tion is "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). If the answer to this second question is yes, the discretionary function exception applies and the United States is immune from suit.

In this case, the conduct giving rise to Stone Cranberry's claims is the USAF's decision to discontinue funding for groundwater remediation at the Ravenbrook Landfill. During oral argument before the Court, both parties agreed that, as to the first question of the analysis, there can be no doubt that the government's conduct at issue was "discretionary." That is, the USAF's decision to halt the Ravenbrook funding was not mandated in any federal statute, regulation, or policy. Therefore, the Court asked the parties to submit supplemental briefs addressing one specific issue: was the USAF's decision to discontinue funding for groundwater remediation at the Ravenbrook Landfill susceptible to policy-related analysis? That is the narrow issue upon which the instant Motion turns. Because the Court is convinced that the USAF's decision was indeed susceptible to policy-related analysis, summary judgment for the United States is appropriate.

### B. *The USAF's Conduct Was Susceptible to Policy–Related Analysis*

 Determining whether government conduct is susceptible to policy-related analysis is an inexact science. *See Gaubert*, 499 U.S. at 335, 111 S.Ct. 1267 (noting that lower courts have had difficulty in applying this part of the test) (Scalia, J., concurring). The Court is not without guideposts in making this determination, however, and these guideposts merit brief mention here. First, the policy underlying the discretionary function exception is to protect the government's decision-making ability and to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy. By creating an exception for discretionary decisions, Congress intended to protect the government from liability that would seriously handicap efficient government operations. *Wood v. United States*, 290 F.3d 29, 36 (1st Cir. 2002) (internal quotations and citations omitted). Second, the United States benefits from a presumption that discretionary acts are grounded in public policy. *Bolduc*, 402 F.3d at 62 (citing *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267). It is the plaintiff's burden to rebut this presumption and demonstrate that particular discretionary conduct is not susceptible to policy-related judgments. *Id.* Finally, and perhaps most importantly, the subjective intent of government officials is irrelevant to the Court's analysis. *Shansky*, 164 F.3d at 692. Courts are called to evaluate the nature of the conduct in question, not how the decision was actually made. The Fourth Circuit has illustrated the point well:

> Rather than requiring a fact-based inquiry into the circumstances surrounding the government actor's exercise of a particular discretionary function, we are of opinion that a reviewing court in the usual case is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy.

*Baum v. United States*, 986 F.2d 716, 720–21 (4th Cir.1993). Against the backdrop of these general principles, the Court finds that the Air Force's decision to halt funding for the Ravenbrook clean-up was susceptible to policy-related analysis.

The USAF's decision to halt funding at Ravenbrook was susceptible to policy-related analysis because the nature of the decision brought to bear economic policy

considerations of the most fundamental kind. *United States v. Varig Airlines*, 467 U.S. 797, 820, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) (holding that decisions grounded in social, political, or *economic* policy are protected) (emphasis added). We live in a world of finite public resources and government officials must weigh competing considerations when deciding where to spend the limited amount of funds that are allocated for governmental programs. *See Muniz–Rivera*, 326 F.3d at 17. As the Court of Appeals in this Circuit recently held "[d]ecisions are thought to be susceptible to policy-related judgments if they involve unrestrained balancing of incommensurable values, *including differential allocation of resources among various political objectives*." *Bolduc*, 402 F.3d at 60 (emphasis added). Prioritization of this kind involves examination of priorities and determinations of need that are at the heart of policy-making. Allocation of resources and budget management are "quintessentially policy-based choices," *Limar Shipping Ltd. v. United States*, 324 F.3d 1, 10 (1st Cir.2003), and "[w]hile such decisions are often difficult to make (and easy to criticize in hindsight), they are clearly susceptible to policy analysis." *Muniz–Rivera*, 326 F.3d at 17.

It bears repeating that the question for the Court is not whether the Air Force *actually* and *subjectively* weighed budgetary policy considerations before deciding to cut funding for the Ravenbrook cleanup. Rather, the proper focus is to look at the nature of the decision at issue in a *general* and *objective* sense, and then determine if the decision is one in which we would expect economic policy considerations to play a role. *Shansky*, 164 F.3d at 692. The general nature of the decision in this case was prioritization of government funds allocated for environmental restoration. Where, as here, the demand for funding far surpasses the resources available, determining who gets how much (and when) is a decision inherently grounded in considerations of economic policy. And even though the Court need not consider the government's subjective decision-making process, doing so here only drives the point home further.[5] The affidavit and deposition of Brian Turcott (Deputy Regional Counsel, USAF) reveal that budgetary constraints and considerations were at the very heart of the Air Force's decision to discontinue funding at Ravenbrook in 1995. In the words of Mr. Turcott:

> [W]hen the invoices and requests for reimbursement from Ravenbrook kept coming in and the projected expenses kept getting higher and higher, that's when I decided this was no longer in the best interests of the Air Force to participate in [the agreement to fund the remediation], that we needed to relook .... I made the recommendation to the regional counsel, who then bounced it off the head of the environmental litigation section in Washington, and they thought that my reasons were valid and that they would support my decision.

(Turcott Dep. pp. 67: 11–16; 70:13–17). The undisputed facts therefore show that (1) the Air Force found itself in a budget crunch [6]; and (2) persons with policy-making authority weighed various options be-

---

5. Evidence of the actual decision may be helpful in understanding whether the "nature" of the decision implicated policy judgments. *Cope v. Scott*, 45 F.3d 445, 449 (D.C.Cir.1995).

6. After the government decided to discontinue funding, but before their decision went into effect, the Air Force's budget crunch was exacerbated when Congress cut the Defense Environmental Restoration Budget by $300 million. In the words of Mr. Turcott, "That was such a huge cut that it completely change[d] the options [ ] for the Air Force.... In fact, it virtually eliminated us as a funding source." (Turcott Dep. at pp. 88:21–89:4).

fore ultimately deciding to halt funding. Allocation of resources and budget management of this kind is "clearly susceptible to policy analysis." *Muniz–Rivera*, 326 F.3d at 17.

One of Plaintiff's arguments against summary judgment merits analysis before concluding this matter. Plaintiff contends that actions of the government receive protection from the discretionary function exception only where they are grounded in the social, economic, or political goals *of a statute or regulation.* That is, if the acts complained of are not authorized by or the subject of any statutory or regulatory scheme, they can neither be discretionary, nor susceptible to policy analysis. *See, e.g., Birnbaum v. United States,* 588 F.2d 319, 329 (2d Cir.1978) ("A discretionary function can derive only from properly delegated authority. Authority generally stems from a statute or regulation, or at least, from a jurisdictional grant that brings the discretionary function within the competence of the agency."). This argument, though not without precedent, finds no traction on these facts. Again, the conduct at issue here is discontinuation of funding for environmental remediation at the Ravenbrook Landfill. If there were no statutory or regulatory basis for funding the remediation in the first place, Plaintiff's argument might carry the day.

The undisputed facts belie such a conclusion.

The Air Force's primary source of funding for environmental remediation is the Defense Environmental Restoration Program ("DERP"), 10 U.S.C. § 2701, *et seq.* Plaintiff seizes on language in 10 U.S.C. § 2701 that, at first glance, appears to limit expenditure of DERP funds to government-owned facilities (Ravenbrook was a privately-owned facility).[7] However, although the DERP is directed primarily to defense sites presently or formerly possessed by the United States, Section 2703 of the statute authorizes funding for cleanup activities at non-governmental, third-party sites (like the Ravenbrook Landfill).[8] Department of Defense Instruction No. 4715.7 (Ex. A to Def.'s Supplemental Mem.) ("DoD Instruction") illustrates the statute's applicability to third-part sites by stating that, in addition to covering possessions controlled by the Department of Defense, (*See, e.g.,* DoD Instruction at ¶ 2.2), the DERP "[a]pplies to *other* sites for which the Department of Defense may be a potentially responsible party." (DoD Instruction at ¶ 2.4) (emphasis added). Indeed, the DoD Instruction calls upon the various military departments, including the Air Force, to "[a]ddress third-party site claims arising from disposal of waste by [a Department of Defense] component." (*Id.* at ¶ 5.6.18).

7. 10 U.S.C. § 2701(c)(1)(A) & (B) provides in pertinent part that:
 (c) Responsibility for response actions.
 (1) Basic Responsibility. The Secretary shall carry out (in accordance with the provisions of this chapter and CERCLA) all response actions with respect to releases of hazardous substances from each of the following:
 (A) Each facility or site owned by, leased to, or otherwise possessed *by the United States and under the jurisdiction of the Secretary.*
 (B) Each facility or site which was under the jurisdiction of the Secretary and owned by, leased to, or otherwise possessed *by the United States* at the time of actions leading to contamination by hazardous substances.

8. 10 U.S.C. § 2703(c) provides in pertinent part that funds authorized by Section 2703(a) "may be obligated or expended from the account only to carry out the environmental restoration functions of the Secretary of Defense and the Secretaries of the military departments under this chapter *and under any other provision of law.*" (emphasis added).

Common sense dictates that when the Air Force initially agreed to fund remediation activities at the Ravenbrook Landfill, the money had to come from somewhere. The undisputed facts show that that "somewhere" was the Air Force's Environmental Restoration Account, established by statute at 10 U.S.C. § 2703(a)(4). (*See* Decl. of Brian Turcott at ¶ 5).[9] Because the Air Force possessed discretion with respect to how those funds would be best distributed, and because its decision to exercise that discretion and halt funding at the Ravenbrook involved little more than a "differential allocation of resources among various political objectives," *Bolduc*, 402 F.3d at 60, the discretionary function exception to the FTCA applies and the United States is immune from suit.

### CONCLUSION

For the reasons mentioned above, Summary Judgment is granted in favor of the Defendant United States of America.

SO ORDERED.

---

9. The Declaration of Brian Turcott can be found in the Appendix to the United States' Motion to Dismiss or, in the Alternative, for Summary Judgment at pp. 70–73.