**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-2106**

LAURIE L. WOOD,

              Plaintiff - Appellant,

      v.

UNITED STATES OF AMERICA,

              Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.   Raymond A. Jackson, District Judge.   (2:14-cv-00469-RAJ-TEM)

Argued:  October 26, 2016            Decided:  January 4, 2017

Before WILKINSON, NIEMEYER, and SHEDD, Circuit Judges.

Affirmed by published opinion.   Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge Shedd joined.

**ARGUED:** Timothy Jon DeMore, DEMORE LAW FIRM, Syracuse, New York, for Appellant.   Kent Pendleton Porter, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.   **ON BRIEF:** Matthew D. Green, Gibson S. Wright, MORRIS & MORRIS, P.C., Richmond, Virginia; Brittany E. Aungier, HISCOCK & BARCLAY, LLP, Syracuse, New York, for Appellant.   Dana J. Boente, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

NIEMEYER, Circuit Judge:

Laurie Wood, a City of Norfolk (Virginia) Sheriff's Deputy, was seriously injured during a training session on a Navy base when she jumped from a training structure onto a set of mats, landing in a gap between them. She commenced this action against the United States under the Federal Tort Claims Act ("FTCA"), alleging that Navy officers negligently allowed the structure, particularly the mats placed adjacent to it, to remain in a dangerous condition and failed to warn her of the dangerous gap between the mats. The district court granted the government's motion to dismiss, concluding that the challenged Navy conduct fell within the FTCA's "discretionary function exception" and therefore that Congress had not waived sovereign immunity for Wood's claim.

On appeal, Wood contends that her complaint alleged a straightforward negligence claim under Virginia law, for which the United States waived sovereign immunity in the FTCA. Specifically, she argues that the Navy's conduct was "not discretionary in nature" so as to be excluded from the waiver of sovereign immunity because it was not the sort of conduct that the discretionary function exception was intended to protect.

Because we conclude that the Navy's decisions regarding the maintenance of its military bases for use by civilian law

2

enforcement involved policy judgments that Congress sought to shield from tort liability under the FTCA, we affirm.

I

Wood was injured while using a piece of training equipment located within the Naval Support Activity Hampton Roads, Northwest Annex ("Northwest Annex"), a restricted access military base of some 3,600 acres in Chesapeake, Virginia. The Northwest Annex, which was owned and operated by the Navy, was managed by two Navy instrumentalities -- the Marine Corps Security Force Training Company and the Navy's Center for Security Forces.

By statute, the Department of Defense is authorized to make military facilities such as the Northwest Annex available to state and local civilian law enforcement officers for training purposes, 10 U.S.C. § 372, and to train civilian officers to use those facilities, id. § 373, so long as the civilian training does not "adversely affect the military preparedness of the United States," id. § 376. A Department of Defense directive and several military orders set forth policies regarding the use of military facilities by civilian law enforcement generally, and Standard Operating Procedures set forth procedures governing law enforcement's use of the Northwest Annex specifically.

3

Before any civilian law enforcement agency may use Northwest Annex facilities for training, one of its officers must qualify under a Marine Corps training program as a Range Safety Officer. During that training, the civilian officer is provided with excerpts of the Standard Operating Procedures, which outline the officer's duties as a Range Safety Officer. The officer is instructed on how to schedule the facilities, coach his fellow officers on the range, respond to accidents, and perform other "basic duties." The officer is also shown a slideshow that admonishes all Range Safety Officers to "REMEMBER! The [Range Safety Officer] is solely responsible for the safety and the proper conduct of the training" at the Navy facility. Once a civilian officer qualifies as a Range Safety Officer, he may schedule use of the Northwest Annex for his law enforcement agency by submitting a request form that specifies the facilities and equipment being requested. This form must then be approved by a Navy or Marine Corps official, depending on which branch is responsible for the requested facility.

Sergeant Brad Ward of the City of Norfolk Sheriff's Office qualified as a Range Safety Officer in 2011, and in February 2012, he requested use of two facilities at the Northwest Annex -- "Munro Village," an outdoor tactical training facility designed to resemble a city block, and the "Simunition House." Sergeant Ward's request form did not include a request for use

4

of the "Ship Mockup," although the form also listed that facility as available. His request was approved by an officer of the Marine Corps, which managed Munro Village.

The "Ship Mockup," which is managed by the Navy and on which Wood was injured, is located near Munro Village and is within the same general area. That equipment, which the Navy referred to as the "Ship in a Box" or the "mock-ship," was a prismatic, three-story structure designed to resemble a foreign merchant ship. The Navy used the equipment to simulate ship-boarding by having soldiers -- clad in armor and strapped into safety harnesses -- climb a ladder onto the mock-ship's third deck. Several mats were placed beneath the ladder both to recreate the difficulty of beginning a climb from an inflatable boat and to provide additional fall protection if a soldier's harness were to fail.

On April 20, 2012, Wood and other officers, who shared responsibility for training the Sheriff's Office's deputies, arrived at the Northwest Annex in preparation for the training exercises. As Wood and the other Sheriff's Office instructors walked through the Munro Village training facility, they discussed using the mock-ship to create a "bail-out" scenario for trainees to practice exiting a building at an elevated height. They contemplated that the trainees would jump from the mock-ship onto the mats below from the second story, a height of

5

some 20 feet. One instructor, seeking to demonstrate the exercise, climbed up onto the mock-ship's first story and jumped out onto the mats without incident. Wood then climbed onto the second story and jumped off. When she landed, however, two of the mats separated, and she fell through the gap onto the ground. The fall caused a burst fracture of her twelfth thoratic vertebra, rendering her a paraplegic.

After Wood's administrative claim for damages was denied by the Navy, she commenced this action under the FTCA against the United States. She alleged that the United States negligently maintained the mock-ship in a dangerous condition by (1) failing to secure a "top pad" to the mock-ship's mats to prevent them from separating; (2) failing adequately to inspect the condition of the mock-ship and its mats; and (3) failing to warn her, as a lawful invitee, of the dangerous condition created by the possibility of mat separation. The government filed a motion to dismiss Wood's complaint, contending that the Navy's challenged conduct -- consisting of safety-related decisions regarding its training facilities when used by civilian law enforcement agencies -- fell within the FTCA's discretionary function exception and that therefore the United States could not be sued. The district court agreed and entered an order dismissing Wood's complaint for a lack of subject matter jurisdiction.

After the court entered its order of dismissal, Wood filed a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), claiming that the district court's dismissal of her complaint without allowing for discovery contravened our decision in Kerns v. United States, 585 F.3d 187 (4th Cir. 2009). The district court, however, found that Kerns was inapplicable because "jurisdictional facts" regarding the applicability of the discretionary function exception were not "'inextricably intertwined' with the merits of Plaintiff's claim." Accordingly, it denied Wood's motion.

From the district court's May 14, 2015 order dismissing her complaint and its August 31, 2015 order denying her motion to alter or amend the judgment, Wood filed this appeal.

II

"[N]o action lies against the United States unless the legislature has authorized it." Dalehite v. United States, 346 U.S. 15, 30 (1953).

In the FTCA, Congress waived sovereign immunity for claims brought against the United States based on the negligence or wrongful acts or omissions of its employees committed within the scope of employment, accepting liability in the same manner and to the same extent as a private individual would have under like circumstances. 28 U.S.C. §§ 1346(b)(1), 2671–2680. This

waiver, however, is circumscribed by numerous exceptions, including an exception for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Id. § 2680(a) (emphasis added). Because waivers of sovereign immunity must be strictly construed, the plaintiff bears the burden of demonstrating jurisdiction and showing that none of the FTCA's exceptions apply. See Welch v. United States, 409 F.3d 646, 651 (4th Cir. 2005).

In this case, the government challenged the district court's jurisdiction based on the discretionary function exception set forth in § 2680(a), and therefore Wood had the burden of demonstrating that that exception did not apply. To carry her burden, she alleged that the United States' creation and maintenance of an unsafe condition at the mock-ship and its failure to warn her of the condition were "not discretionary in nature and therefore [were] not excepted as discretionary acts from the government's waiver of sovereign immunity."

Acting on the government's motion, the district court dismissed Wood's complaint, concluding that Wood did not carry her burden. In reaching its conclusion, the district court read Wood's complaint to challenge the government's conduct in "the military's maintenance decisions regarding the [mock-ship] as an

8

unauthorized military facility, as opposed to a military facility that has been approved for civilian use." It concluded that

> the government's maintenance of the [mock-ship] when it has not been approved for civilian use falls under the [discretionary function exception] because it implicates financial and staffing considerations. Equipment and facility maintenance considerations, as well as calculations balancing the benefit of increased safety measures and increased costs, objectively fall into the category of decisions that are susceptible to policy analysis.

On appeal, Wood contends that her claim for premises liability is a "garden variety" negligence claim that involves the failure to make premises safe for invitees or to give them warning of a known danger. She asserts that Congress did not intend for these "run of the mill" acts to be shielded by the discretionary function exception. She adds that the government's focus on the training facility's purposes and the Navy's mission in maintaining the premises is "merely a distraction." She also argues that its focus is too broad and general and, moreover, that the district court's description of her use of the mock-ship as "unauthorized" is not supported by her allegations, which must be accepted at this stage in the proceedings.

The government contends, on the other hand, that Wood's characterization of the conduct at issue is too narrow, collapsing the discretionary function inquiry into the question

9

of negligence on the merits. The government asserts that Wood's complaint actually challenges government decisions regarding the maintenance and inspection of, or the issuance of warnings relating to, military training facilities used by civilian law enforcement. Such decisions, it argues, are within the discretionary function exception for which the government has not waived immunity in the FTCA.

The determination of whether the discretionary function exception applies requires application of a two-step analysis. First, a court must determine whether the conduct in question "involves an element of judgment or choice." Berkovitz ex rel. Berkovitz v. United States, 486 U.S. 531, 536 (1988). When a statute, regulation, or policy prescribes the employee's conduct, the conduct cannot be discretionary and thus is unprotected by the discretionary function exception. Id.; see also United States v. Gaubert, 499 U.S. 315, 322 (1991); Seaside Farm, Inc. v. United States, No. 15-2562, ___ F.3d ___, 2016 WL 7030629, at *3 (4th Cir. 2016). Second, when the challenged conduct is the product of judgment or choice, the court must still determine whether the decision made was "based on considerations of public policy." Berkovitz, 486 U.S. at 537. This second step of the analysis is designed to prohibit courts from "second guessing" decisions "grounded in social, economic, and political policy through the medium of an action in tort."

10

*Gaubert*, 499 U.S. at 323 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797, 814 (1984)). And in this same vein, "when established government policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 324 (emphasis added). In short, the discretionary function exception is driven by separation of powers concerns, shielding decisions of a government entity made within the scope of any regulatory policy expressed in statute, regulation, or policy guidance, even when made negligently.

The analysis of whether the discretionary function exception applies does not depend on whether the government employee had subjective knowledge of his discretion or subjectively intended to exercise it; the analysis must focus objectively on "the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325; *see also* *Seaside Farm*, 2016 WL 7030629, at *3; *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993).

The analysis also does not depend on whether the conduct was that of a high-level agency official making policy or a low-level employee implementing policy. *See* *Dalehite*, 346 U.S. at 35-36. Rather, the analysis must focus solely on whether the

11

government conduct involved choice implicating policy. Gaubert, 499 U.S. at 323. Indeed, relying on a distinction between "day-to-day" actions and "policymaking or planning functions" would be inappropriate in light of the principle that "[d]iscretionary conduct is not confined to policy or planning level. 'It is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.'" Id. at 325 (alteration omitted) (quoting Varig Airlines, 467 U.S. at 813).

Thus, in Baum v. United States, 986 F.2d 716 (4th Cir. 1993), we ordered dismissal of a suit alleging, in relevant part, that the National Park Service negligently failed to replace a deteriorating guardrail system that broke when the plaintiffs' car struck it. 986 F.2d at 718. We concluded that, just as a statute gave the Park Service discretion to construct the bridge without fear that courts would second-guess its design choices, the FTCA shielded the agency's "decision of how and when to replace a major element of [that] substantial public facility." Id. at 724; see also Bowman v. United States, 820 F.2d 1393, 1395 (4th Cir. 1987) (holding, on similar facts, that "[w]hether [the] decision grew out of a lack of financial resources, a desire to preserve the natural beauty of the vista, a judgment that the hazard was insufficient to warrant a

guardrail, or a combination of all three, . . . [it] is obvious that the decision was the result of a policy judgment").

Therefore, taking the facts alleged by Wood in this case as defining the challenged government actions, see Gaubert, 499 U.S. at 325, and applying the two-step analysis to them, we must determine, on an objective basis, whether the challenged government conduct involved decisions based on considerations of public policy.

Wood alleges, in essence, that pursuant to a request made by the Norfolk Sheriff's Office, the Navy authorized that Office to conduct training exercises on the Navy base in April 2012. She alleges that the Navy was negligent in failing to maintain in a safe configuration the mats on which she was injured, by failing to inspect the mats for the dangerous condition, and by failing to warn invitees, such as Wood, about the dangerous condition. In short, she makes a premises liability claim as an invitee to a Navy military base, and we must decide therefore whether these actions that she challenges are protected by the discretionary function exception.

Applying the two-step analysis to this conduct, we determine first whether the government conduct involved an element of choice, which in turn requires the determination of whether any federal statute, regulation, or policy prescribed the conduct. See Berkovitz, 486 U.S. at 536. On this aspect of

13

the analysis, the parties apparently agree that there was no mandate contained in any statute, regulation, or policy regarding the maintenance, inspection, and warning with regard to either the mats or the mock-ship. In responding to the government's motion to dismiss, Wood conceded that she was unable to find any such statute, regulation, or military policy, and she does not argue otherwise on appeal. In addition, the government presented affidavits from a Navy captain, a Marine Corps colonel, and the Range Manager at Northwest Annex, stating that there is no policy directly governing such maintenance, inspection, and warning procedures when the facilities are used by a civilian law enforcement agency. Further, the Marine Corps order governing range safety does not require the military to take any specific safety precautions with respect to facilities that are to be used by civilians. Instead, it requires only that civilian agencies, who "may use [military] ranges at the discretion of the installation commander," must "comply with the provisions of this regulation/order." See Range Safety, Army Reg. 385-63, MCO 3570.1C (2012). And the Standard Operating Procedures that apply specifically to the Northwest Annex prescribe no actions with respect to base safety. As a consequence, the government conduct involving the safety of the mock-ship and the mats required Navy personnel to make choices or exercise judgment.

Even so, for the discretionary function exception to apply, those choices or judgments must also have been "based on considerations of public policy" and thus "of the kind that the discretionary function exception was designed to shield." Berkovitz, 486 U.S. at 537. In addressing this second step of the analysis, we look to the "objective," "general" nature of the challenged actions and decide whether they inherently involved protected policy judgments. Baum, 986 F.2d at 720-21.

We note first that the statutory scheme governing civilian use of military facilities sets out a basic policy tradeoff between permissive civilian training and constrained military resources. See Gaubert, 499 U.S. at 324 ("[T]he general aims and policies of the controlling statute will [typically] be evident from its text"). The statutes provide that the Department of Defense may allow civilian law enforcement agencies to use Navy facilities, 10 U.S.C. § 372, and may train civilian officers "in the operation and maintenance of equipment," id. § 373. But they also instruct that civilian use must not interfere with the nation's "military preparedness." Id. § 376. There can be no doubt therefore that the Navy's first-order decision of whether to allow civilian use of its bases at all is shielded by the discretionary function exception.

15

In allowing civilian use of the Northwest Annex in the particular circumstances of this case, the Navy also had to make several additional decisions -- each under the umbrella of its initial decision to allow civilians to use the base at all -- and these decisions were necessarily informed by the same policy considerations expressed in the statutes. This is made evident by the Navy's internal policy documents covering civilian use of the facility. See Gaubert, 499 U.S. at 324 ("[A]n agency may rely on internal guidelines rather than on published regulations"). For example, in deciding whether to authorize use of its base by civilian officers, the Navy has chosen to require that one of those officers qualify as a Range Safety Officer, who is required to be "solely responsible for the safety" of their civilian agency while training on the base. A Navy policy manual also indicates that its officers should provide assistance to local law enforcement "at the lowest cost practicable." Similar documents more generally set forth risk-management frameworks for all Navy decisionmaking. See Chief of Naval Operations Instruction 3500.39C (July 2, 2010). The common thread running through the relevant statutes and policy documents is a recognition that, whenever the Navy exercises its statutory discretion to allow civilian agencies to use its facilities, it must take into account in exercising its judgment military preparedness, the safety of the civilian agencies, and

16

costs. This complicated balance is well illustrated here. Given the designed purpose of the mock-ship and the mats, which were intended only as backup protection for armored soldiers climbing the ship in harnesses, it could be unjustifiably costly to protect against and warn civilian trainees of the dangers arising out of uses for which the facility was not designed. See Baum, 986 F.2d at 722-24 (economic policy considerations underlying bridge construction project encompassed subsequent decisions involving bridge maintenance).

At bottom, the Navy's decision to leave the mats near the mock-ship in a certain condition, its allegedly infrequent inspections of the mock-ship, its decision not to warn civilian trainees itself about the condition of the ship, and its decision to qualify the user's agent as a Range Safety Officer responsible for safety each fall comfortably within that overarching policy of balancing open civilian use, civilian safety, military preparedness, and costs. And "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion," as here, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324 (emphasis added).

Wood argues that if the Navy's maintenance decisions are protected here, it is difficult to see how the United States

17

could ever be liable for injuries on government property. She cites cases from courts in other circuits that have expressed similar concerns in declining to extend the discretionary function exception to particular premises-liability claims. In our view, however, the requirement that shielded conduct be taken pursuant to specific policies expressed in federal law explains some of those courts' reluctance to apply the discretionary function exception in the particular circumstances presented. For example, in Gotha v. United States, 115 F.3d 176, 178 (3d Cir. 1997), a Navy contractor's employee slipped and fell on a military base footpath. In the absence of any statutory, regulatory, or internal policy evidence encompassing the Navy's decisions with respect to employee safety, the Gotha court refused to endorse the government's theory that its conduct inherently involved balancing national security and employee safety. Id. at 181-82.

The reasoning in Gotha, however, has little application here, where the Navy's maintenance decisions with respect to facilities used by civilian law enforcement fall within the overarching policies of a regulatory scheme that gives officers discretion in how to implement that policy. In this case, where Congress by statute and the Navy by internal policy have established a regulatory mission of making military bases available for civilian-law-enforcement training, the Navy's

18

decisions affecting the safety of its bases for civilian trainees should not be subjected to judicial second-guessing. Were we to hold, for example, that Wood could challenge the Navy's decision not to place a warning sign near the mock-ship, it would open the Navy to tort liability for every similar decision made when allowing civilian law enforcement agencies to use its facilities. The threat of tort liability would become a tool to shape Navy policy, which is exactly what the discretionary function exception seeks to avoid.

Wood also contends that the district court incorrectly defined the government's challenged conduct as "maintenance decisions regarding the [mock-ship] as an unauthorized military facility" -- a description that assumed, contrary to her claim, that her use of the mock-ship was not authorized and thereby dictated the court's decision. To be sure, while the district court did repeatedly express its assumption that the mock-ship was unauthorized, its ultimate decision did not necessarily rest on that assumption. The district court observed that "the considerations that apply to this decision are magnified when the issue is the military's maintenance of unauthorized facilities." Moreover, its holding was grounded centrally on the fact that the Navy exercised discretion with respect to public policy. As the court stated:

19

In this case, the military has declined to adopt any policy to conduct pre-training inspections in order to ensure that requested facilities are safe for civilian use. Instead, the responsibility to conduct pre-training inspections is with the [Range Safety Officer]. . . . The Court finds that [these matters are susceptible to policy analysis] because these day-to-day operational maintenance decisions regarding the condition in which military facilities are to be left in when they are not in use, implicate economic policy in that they involve considerations such as allocation of military resources.

Thus, while the district court ruled with the assumption that the mock-ship's use was unauthorized, its reasoning applied equally to a situation where use of the mock-ship was authorized.

In any event, whether use of the mock-ship was authorized or not does not implicate whether the district court had jurisdiction under the FTCA. As we have pointed out, the permissive use of the Navy's training facilities by civilian law enforcement is covered by policies announced in statutes, regulations, and orders, and officers' implementation of these policies through decisions with respect to the mock-ship and the mats is therefore protected by the discretionary function exception.

At bottom, we conclude that the government's challenged conduct here falls within the FTCA's discretionary function exception and therefore that the district court correctly concluded that Congress did not, in the FTCA, waive the

20

sovereign immunity of the United States for Wood's negligence claim.

                                    III

Wood also contends that the district court abused its discretion in denying her motion to amend the judgment under Federal Rule of Civil Procedure 59(e) to allow her to engage in jurisdictional discovery, as provided in Kerns, 585 F.3d 187. She argues in particular that the district court should have allowed discovery of whether her use of the mock-ship was unauthorized, which "weighed heavily upon the [District] Court's analysis."

In Kerns, we reversed an order dismissing a plaintiff's complaint under Rule 12(b)(1) because the facts supporting FTCA jurisdiction -- bearing on whether the defendant was driving within the scope of her employment -- were "inextricably intertwined" with the merits of the plaintiff's tort claim. 585 F.3d at 195. The Kerns decision sought to ensure that plaintiffs facing a motion to dismiss were not unfairly deprived of the additional "procedural safeguards" in Rule 56 (governing summary judgment) when the merits of their claims are bound up with jurisdictional issues. Id. at 195-96.

Kerns, however, does not apply here. As explained above, the application of the discretionary function exception does not

turn on whether Wood was authorized to use the mock-ship. That fact would indeed be relevant to the <u>merits</u> of Wood's tort claim. But it is irrelevant to subject matter jurisdiction. <u>See</u> <u>Seaside Farm</u>, 2016 WL 7030629, at *3. Accordingly, we conclude that the district court did not abuse its discretion in refusing to open discovery to the merits issue in this case.

\* \* \*

For the reasons given, the district court's order dismissing Wood's complaint for lack of subject matter jurisdiction and its order denying her Rule 59(e) motion are

<u>AFFIRMED</u>.