**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1878**

CAROL V. CLENDENING, as Personal Representative of the Estate of Gary J. Clendening,

      Plaintiff - Appellant,

    v.

UNITED STATES OF AMERICA,

      Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. W. Earl Britt, Senior District Judge. (7:19-cv-00137-BR)

Argued: September 21, 2021                    Decided: November 30, 2021

Before AGEE and WYNN, Circuit Judges, and Frank W. VOLK, United States District Judge for the Southern District of West Virginia, sitting by designation.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Agee and Judge Volk joined.

**ARGUED:** Nicholas Frederick Baker, NICK BAKER LAW LLC, Indianapolis, Indiana, for Appellant. Daniel Tenny, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Jeffrey Bossert Clark, Acting Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert J. Higdon, Jr., United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

WYNN, Circuit Judge:

In 2019, Carol V. Clendening ("Plaintiff") filed suit against the United States for her husband's wrongful death allegedly caused by his exposure to contaminated water and environmental toxins while stationed at the Marine Corps Base Camp Lejeune in Jacksonville, North Carolina. Her complaint also asserted claims against the United States for its subsequent fraudulent concealment and failure to warn relevant personnel of the severity, scope, and impact of said exposure.

The district court dismissed all claims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Because we find that Plaintiff's claims are barred under the Federal Torts Claims Act, we affirm the district court's dismissal.

I.

The following facts are taken from Plaintiff's complaint. On November 16, 2016, Gary Clendening ("Clendening") lost his years-long battle against adult leukemia, Waldenstrom macroglobulinemia, and chronic lymphoblastic lymphoma. His widow, Plaintiff, claims her husband's death resulted from his constant exposure, while stationed on active military duty at Camp Lejeune, to contaminated water and "radioactive waste, chemical weapon waste, solvents, benzene, and other carcinogens that were improperly disposed, buried or spilled at" the base. J.A. 5.[1]

From May 1970 to December 1971, Clendening resided at Camp Lejeune while serving as a United States Marine Officer in the Judge Advocate Division of the Marine

---

[1] Citations to the J.A. refer to the Joint Appendix filed by the parties in this appeal.

2

Corps. Clendening lived in the Hadnot Point area of the base, located near the Hadnot Point Fuel Farm, a former incinerator and landfill. At some point in time, the Hadnot Point Fuel Farm tanks began to leak, contaminating the water supply with "fuel products" and other "hazardous materials." J.A. 9, 20. By 1980, the Government was aware of the leakage but issued no warnings regarding the resulting potential health or safety effects.

That same year, a contractor discovered "radioactive Strontium 90 (Sr-90) pellets and dead beagles" buried "just below the surface of the ground" near where Clendening was stationed. J.A. 9–10. Subsequent analysis conducted in 1981 found elevated levels of Sr-90 in the area. Yet the Government still took no action to inform exposed personnel or shut down the potentially contaminated waterways. In 1984, additional testing revealed benzene contamination in a Hadnot Point drinking well, which led to the subsequent closure of that well and to the review and closure of several other wells on base. By 1985, all identified contaminated wells supplied by the Hadnot Point Water Treatment Plant distribution network were shut down due to the presence of volatile organic compounds in the network. Three years later, a monitoring report "described a 15-foot layer of fuel floating" atop the water table below the Hadnot Point Fuel Farm and identified significant benzene levels in nearby wells. J.A. 21.

As a result of the numerous contamination reports, Camp Lejeune was placed on the Environmental Protection Agency's Superfund National Priorities List in 1989. All investigation and remediation activities at the base were subsequently "placed under the oversight of" the federal government pursuant to the Resource Conservation and Recovery Act and the Comprehensive Environmental Response, Compensation, and Liability Act.

3

J.A. 21–22. A "review of environmental treatment options" in 1993 unearthed "storage tanks containing fuel, cleaning solvents and other chemicals" that "had been buried at sites across Camp Lejeune for years." J.A. 22. The Department of Health and Human Services's Agency for Toxic Substances and Disease Registry ("Agency for Toxic Substances") published a Public Health Assessment for Camp Lejeune in 1997. However, in 2009, the Agency for Toxic Substances took the Public Health Assessment down from its website, in part because it failed to discuss the extent of benzene exposure.

Two years after the assessment was removed from the website, the Government "directed" the Agency for Toxic Substances "to attempt to survey former Camp Lejeune employees' health conditions." J.A. 18. In 2012, the Agency for Toxic Substances issued a new report detailing significant contamination of the water supply at Camp Lejeune, including at Hadnot Point. Two years later, the Centers for Disease Control and Prevention reported that individuals stationed at Camp Lejeune had a 68% higher risk of developing multiple myeloma. In 2016, the Department of Veterans Affairs "adopted regulations [stating] that . . . eight associated diseases including . . . adult leukemia were presumed to have been caused by . . . exposure at Camp Lejeune." *Id.*

In 2019, two and a half years after Clendening's death, Plaintiff filed the instant suit pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680. She alleged (1) fraudulent and "willfully and wantonly negligent" conduct pertaining to the exposure of military personnel to dangerous chemicals and the subsequent failure to warn of the same, (2) fraudulent concealment, (3) fraudulent publication of notice to the public, (4)

4

wrongful death due to water contamination, and (5) wrongful death from direct exposure not incident to Clendening's service. J.A. 26.

The Government moved to dismiss under Rule 12(b)(1), arguing that Plaintiff's claims were barred by the rule announced in *Feres v. United States*, 340 U.S. 135 (1950); the Federal Tort Claims Act's "discretionary-function" exception, 28 U.S.C. § 2680(a); or both. The district court dismissed all claims for lack of subject-matter jurisdiction, *Clendening v. United States*, No. 7:19-CV-137-BR, 2020 WL 3404733, *2–6 (E.D.N.C. June 19, 2020), and Clendening timely appealed.

## II.

Whether a claim falls within the purview of the Federal Tort Claims Act presents an issue of subject-matter jurisdiction that we review de novo. *Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015).

"As a general matter, the United States is immune from suit unless it waives that immunity." *Sanders v. United States*, 937 F.3d 316, 327 (4th Cir. 2019) (quoting *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 341 (4th Cir. 2014)). The Federal Tort Claims Act creates a limited waiver of the United States' sovereign immunity, generally making the Government liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. But that waiver is curtailed by several exceptions. 28 U.S.C. § 2680; *Feres*, 340 U.S. at 146; *Hancox v. Performance Anesthesia, P.A.*, 455 F. App'x 369, 371 (4th Cir. 2011) (per curiam). The plaintiff bears the burden of showing "that none of the statute's waiver exceptions apply to [her] particular claim."

*Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005). If the plaintiff cannot satisfy this burden, "then the claim must be dismissed." *Id.*

Plaintiff argues that her claims may proceed under the Federal Tort Claims Act. But the district court found that two different exceptions to the Act's limited waiver required dismissal of her claims, concluding (1) that the *Feres* doctrine barred Plaintiff's tort claims for Clendening's exposure to contaminated water and other toxins while living at Camp Lejeune, and (2) that to the extent a failure-to-warn claim survived *Feres*, it was also barred under the discretionary-function exception. *Clendening*, 2020 WL 3404733, at *4–6.

Plaintiff challenges both conclusions on appeal. First, she asserts that the *Feres* doctrine does not apply to this case because Clendening's exposure was not "incident to any military project" and because the "[G]overnment's conduct served no military purpose." Opening Br. at 24. Alternatively, she asks that, should this Court find *Feres* applies, we abridge or overturn it. Second, Plaintiff argues that the discretionary-function exception does not apply to the military's failure to provide clean drinking water nor to its subsequent failure to warn. We address each issue in turn.

A.

We first consider the applicability of what's known as the *Feres* doctrine. Shortly after the Federal Tort Claims Act became law in 1946, the Supreme Court considered a series of cases in which service members or their executors sued the United States for injuries sustained "due to negligence of others in the armed forces." *Feres*, 340 U.S. at 138 (1950). The Court concluded that "the Government is not liable under the Federal Tort

6

Claims Act for injuries to servicemen where the injuries *arise out of or are in the course of activity incident to service.*" *Id.* at 146 (emphasis added).[2]

There is no "specific element-based or bright-line rule" for determining whether certain conduct was "incident to service."[3] *Aikens v. Ingram*, 811 F.3d 643, 650 (4th Cir. 2016), *as amended* (Feb. 1, 2016) (citing *United States v. Shearer*, 473 U.S. 52, 57 (1985)). Instead, we must ask whether "particular suits would call into question military discipline and decisionmaking [and would] require judicial inquiry into, and hence intrusion upon, military matters." *Cioca v. Rumsfeld*, 720 F.3d 505, 515 (4th Cir. 2013) (alteration in original) (quoting *United States v. Stanley*, 483 U.S. 669, 682 (1987)). "Put another way, where a complaint asserts injuries that stem from the relationship between the plaintiff and the plaintiff's service in the military, the 'incident to service' test is implicated." *Id.*

This test is admittedly "broad and amorphous." *Aikens*, 811 F.3d at 651. And this Court has remarked numerous times on the vast coverage of the *Feres* doctrine, stating that "in recent years the [Supreme] Court has embarked on a course dedicated to broadening the *Feres* doctrine to encompass, at a minimum, *all* injuries suffered by military personnel

---

[2] "The Supreme Court has emphasized three broad rationales underlying the *Feres* doctrine: (1) the distinctly federal nature of the relationship between the government and members of the armed forces, (2) the availability of existing alternative compensation schemes in the military, and (3) the fear of damaging military structure and discipline." *Kendrick v. United States*, 877 F.2d 1201, 1204 (4th Cir. 1989) (citing *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 671–73 (1977)).

[3] Other circuits have adopted more specific factor-based tests. *See, e.g.*, *Gros v. United States*, 232 F. App'x 417, 418 (5th Cir. 2007) (per curiam) ("We consider three factors to determine whether a suit is barred: 1) the duty status of the plaintiff at the time of the incident; 2) whether the incident occurred on or off the base; and 3) the plaintiff's activity at the time of the injury.").

that are even remotely related to the individual's *status* as a member of the military." *Stewart v. United States*, 90 F.3d 102, 105 (4th Cir. 1996) (quoting *Major v. United States*, 835 F.2d 641, 644 (6th Cir. 1987)); *see Aikens*, 811 F.3d at 651.

Accordingly, the "focus" of the *Feres* doctrine "is not upon when the injury occurs or when the claim becomes actionable, rather it is concerned with when and under what circumstances the negligent act occurs." *Kendrick v. United States*, 877 F.2d 1201, 1203 (4th Cir. 1989). While considerations such as the duty status of the service member,[4] whether the injury took place on base, and what activity the service member was engaged in at the time are relevant, they are not always determinative. *See Aikens*, 811 F.3d at 651. Moreover, this test "does not inquire whether the discrete injuries to the victim were committed 'in support of the military mission.'" *Cioca*, 720 F.3d at 515.

With one exception, Plaintiff's claims fall squarely within *Feres* purview. The exposure cited as the cause of Clendening's death occurred in the course of his day-to-day, active-duty service while on base at Camp Lejeune. Clendening's injuries thus "stem[med] from the relationship between [Clendening] and [his] service in the military." *Id.* Moreover, the military's provision of water and accommodations to its troops is clearly activity

---

[4] For example, courts often examine whether the service member was on active duty (including while on liberty), leave, furlough, or entirely discharged at the time the wrongful act occurred. *See Feres*, 340 U.S. at 146. These statuses are usually considered on a spectrum. For instance, in *Lanus v. United States*, the Eleventh Circuit noted that "liberty status," referring to "short time periods, often including weekends, when active-duty personnel are not on authorized leave from duties but are outside normal working hours," was not the equivalent of "furlough, leave, or pass" as it "is not a reprieve from active duty at all." 492 F. App'x 66, 68, 70 n.4 (11th Cir. 2012) (per curiam).

8

"incident to service." *See Aikens*, 811 F.3d at 651 (noting that "[i]ncident to service" is not "a narrow term" and that courts have found service members to be engaged in an activity "incident to service" "when . . . enjoying a drink in a noncommissioned officers club, . . . riding a donkey during a ballgame sponsored by the Special Services division of a naval air station, and while swimming in a swimming pool at an airbase" (quoting *Hass for Use & Benefit of U.S. v. United States*, 518 F.2d 1138, 1141 (4th Cir. 1975))).

Indeed, it is hard to see how Plaintiff's exposure claims are meaningfully different from *Feres* itself. In *Feres*, an active-duty soldier died when his barracks caught fire. *Feres*, 340 U.S. at 137. His estate alleged that the military negligently housed him in a building "known to be unsafe" due to a "defective heating plant" and failed to keep an adequate fire watch. *Id.* The Supreme Court said these claims arose out of activity "incident to service," fell outside the scope of the Federal Tort Claims Act, and were therefore barred by sovereign immunity. *Id.* at 146.

Thus, in *Feres*, as in this case, death allegedly resulted from unsafe living conditions on base. Numerous other courts evaluating claims related to Camp Lejeune agree. *E.g.*, *Gros v. United States*, 232 F. App'x 417, 418–19 (5th Cir. 2007) (per curiam) (affirming dismissal, under *Feres*, of plaintiff's claims stemming from exposure to contaminated water at Camp Lejeune and noting that "there is little to distinguish this case from *Feres* itself"), *aff'g* No. CIV.A.H-04-4665, 2005 WL 6459834, at *2 (S.D. Tex. Sept. 27, 2005) ("The events alleged to have given rise to [plaintiff's] injuries are quite similar to those of *Feres*. In each case, the injuries occurred in the serviceman's home, on military property, during off-duty hours, but not during a period of leave or furlough."); *Foster v. Dep't of*

9

*the Navy*, No. 5:19-CV-429-FL, 2020 WL 1542092, at *3 (E.D.N.C. Mar. 31, 2020) (granting motion to dismiss for lack of subject matter jurisdiction and remarking that plaintiff's Camp Lejeune exposure claim "is indistinguishable from *Feres* itself"); *see also In re Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d 1318, 1342 (N.D. Ga. 2016) (finding service members' claims of exposure while stationed at Camp Lejeune barred by *Feres*), *aff'd on other grounds*, 774 F. App'x 564 (11th Cir. 2019) (per curiam); *Perez v. United States*, No. 09-22201-CIV, 2010 WL 11505507, at *1, *2–5 (S.D. Fla. Mar. 1, 2010) (dismissing under *Feres* claims pertaining to the contamination of the water at Camp Lejeune, the Government's knowing exposure of service members, and the subsequent failure to rectify or warn); *cf. Lanus v. United States*, 492 F. App'x 66, 67–70 (11th Cir. 2012) (per curiam) (barring a claim under *Feres* for wrongful death of an active-duty, on-liberty service member who died while sleeping from a fire allegedly caused by the United States' "negligent upkeep" of assigned housing at a Naval Air Station).[5]

Plaintiff attempts to distinguish *Feres* in three ways, arguing that Clendening's injuries were not related to a military objective and thus not "incident to service"; that another case is more on-point; and that the negligence of *Feres* is distinguishable from the intentional acts here. None of these arguments are persuasive.

---

[5] *But see Elliott v. United States*, 13 F.3d 1555, 1556–57, 1563 (11th Cir.) (finding a claim against the Government for the negligent maintenance of on-base housing, resulting in carbon monoxide poisoning of a service member on leave and his wife, not barred by *Feres*), *reh'g granted and opinion vacated*, 28 F.3d 1076 (11th Cir.), *and on reh'g*, 37 F.3d 617 (11th Cir. 1994) (affirming district court's judgment in favor of plaintiffs due to an evenly divided court).

Plaintiff first suggests that *Feres* only applies where the exposure itself was "related to or served a military objective" or "implicate[s] [a] military function." Opening Br. at 10–11, 16, 28 (citing, among other cases, *Maas v. United States*, 94 F.3d 291, 293–95 (7th Cir. 1996) (barring exposure claim under *Feres* where service members participated in a "clean-up operation" requiring them to "pick up radioactive debris"), and *Hinkie v. United States*, 715 F.2d 96, 98 (3d Cir. 1983) (involving an exposure claim arising from a serviceman's participation in nuclear testing)). But, as previously mentioned, this Court has flatly stated that the "incident to service" rule "does not inquire whether the discrete injuries to the victim were committed 'in support of the military mission.'" *Cioca*, 720 F.3d at 515. "Put another way, where a complaint asserts injuries that stem from the relationship between the plaintiff and the plaintiff's service in the military, the 'incident to service' test is implicated." *Id.* Thus, the fact that Clendening was not specifically ordered to handle contaminants or that the Government has articulated no strategic military purpose for exposing Clendening to dangerous substances is irrelevant.[6]

---

[6] Plaintiff's reliance on *Lutz v. Secretary of Air Force*, 944 F.2d 1477 (9th Cir. 1991), to argue otherwise is unpersuasive. In *Lutz*, three of Major Marsha Lutz's subordinates entered her office, removed personal notes, and copied and disseminated them in an attempt to ruin Major Lutz's military reputation by implying she had "a lesbian relationship with her civilian secretary." *Id.* at 1479–80. The Ninth Circuit found *Feres* not to bar Major Lutz's claims against the *individual* defendants, holding that "[i]ntentional tortious and unconstitutional *acts directed by one servicemember against another* which further no conceivable military purpose and are not perpetrated during the course of a military activity surely are past the reach of *Feres*." *Id.* at 1487 (emphasis added). Here, however, Plaintiff does not assert wrongdoing on the part of any individual service members against Clendening. Instead, she alleges that the Navy itself is culpable.

Second, Plaintiff argues that this case does not fall under *Feres*, but rather its counterpart, *Brooks v. United States*, 337 U.S. 49 (1949), which allowed a service member's claims against the Government to proceed. *Id.* at 52–53; *see* Opening Br. at 24–26. In *Brooks*, two enlisted brothers and their father were driving along a public highway when their car was hit by an army vehicle. 337 U.S. at 50. One of the brothers died in the accident. *Id.* The Supreme Court allowed a tort suit against the Government because the accident "had nothing to do with the [brothers'] army careers," and their injuries were "not caused by their service except in the sense that all human events depend upon what has already transpired." *Id.* at 52. However, just one year later, the Court in *Feres* cabined *Brooks* by finding the fact that the surviving Brooks brother was on furlough at the time of the accident and "under compulsion of no orders or duty and on no military mission" to be a "vital distinction" that explained why Brooks's injury was not "incident to service." *Feres*, 340 U.S. at 146. By contrast, at the time of Clendening's exposure, he was on active-duty status and stationed on base due to his position as a Marine Corps Officer.

Third, Plaintiff contends that the Government's negligence in *Feres* cannot be compared with the intentional, willful, or wanton "poisoning [of] enlisted Marines and civilians" at Camp Lejeune. Reply Br. at 2. Even if Plaintiff had not waived this argument by failing to squarely raise it until her Reply Brief,[7] it is unavailing. Applicability of the *Feres* doctrine depends on whether the injury arose "incident to service," not the

---

[7] A party "waive[s] [an] argument by raising it for the first time in its reply brief." *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 602 n.13 (4th Cir. 2013).

Government's blameworthiness. *See, e.g.*, *Purcell v. United States*, 137 F. App'x 158, 160 (10th Cir. 2005) ("The *Feres* doctrine turns on the relationship of the plaintiff's injury to his or her military service, not the specific tort theory asserted to redress the injury. If it applies, it excepts the federal Government from any liability '*under the [Federal Tort Claims Act]*.'" (quoting *Ricks v. Nickels*, 295 F.3d 1124, 1127 (10th Cir. 2002)). Thus, we and other circuits have repeatedly applied *Feres* to bar claims against the United States even where the wrongful conduct was alleged to be intentional, illegal, or unconstitutional. *See, e.g.*, *Aikens*, 811 F.3d at 649–52 (4th Cir.) (applying *Feres* to bar "constitutional claims brought against state officers under 42 U.S.C. § 1983" that arose "incident to service"); *Trerice v. Summons*, 755 F.2d 1081, 1084–85 (4th Cir. 1985) (recognizing that "*Feres* itself is a bar to *any* common law tort claims" (emphasis added)); *Mackey v. United States*, 226 F.3d 773, 776 (6th Cir. 2000) ("There is no authority in the [Federal Tort Claims Act] or Supreme Court precedent to apply the *Feres* doctrine only to claims of negligence and not to claims of intentional torts."); *Bowen v. Oistead*, 125 F.3d 800, 804 (9th Cir. 1997) ("*Feres* bars intentional tort claims as well as simple negligence claims."); *Kohn v. United States*, 680 F.2d 922, 925 (2d Cir. 1982) ("[T]he *Feres* doctrine applies to both negligent and intentional torts, absent specific statutory exceptions."); *Stanley v. Cent. Intel. Agency*, 639 F.2d 1146, 1152 (5th Cir. Unit B Mar. 1981) (barring a claim under *Feres* despite plaintiff's contention that the wrongful act was "patently illegal"); *Purcell*, 137 F. App'x at 160 & n.1 (10th Cir.) (finding that *Feres* bars both intentional tort and constitutional claims that arise "incident to service").

Her attempts to distinguish *Feres* having failed, Plaintiff implores this Court to overrule, or at least abrogate, *Feres*. To be sure, criticism of the *Feres* doctrine abounds. Justices, judges, and scholars have routinely noted the harsh results brought about by the doctrine, and many have suggested *Feres* itself was wrongly decided.[8] *See, e.g.*, *United States v. Johnson*, 481 U.S. 681, 700–01 (1987) (Scalia, J., dissenting) ("*Feres* was wrongly decided and heartily deserves the 'widespread, almost universal criticism' it has received." (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 580 F. Supp. 1242, 1246 (E.D.N.Y. 1984))); *Lanus v. United States*, 570 U.S. 932, 933 (2013) (Thomas, J., dissenting from denial of certiorari) (agreeing with Justice Scalia's statement in *Johnson* that *Feres* was "wrongly decided," and stating that "[a]t a bare minimum, it should be reconsidered"). However, despite the rampant criticism, the *Feres* doctrine still stands, and this Court is bound by it. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("[T]he Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.").

Accordingly, we affirm the district court's judgment that *Feres* bars all of Plaintiff's claims premised upon Clendening's initial exposure to toxic substances.

---

[8] The particular case of Camp Lejeune has attracted some bipartisan efforts in Congress, including one recent proposal to waive sovereign immunity specifically for those who were exposed to contaminated water at the base. *See* Camp Lejeune Justice Act of 2021, H.R. 2192, 117th Cong. § 2(e) (2021).

14

## B.

That leaves Plaintiff's failure-to-warn claim. Plaintiff alleges that, even after Clendening was discharged, the Government had a duty to warn Clendening of the health risks posed by his exposure to contaminants at Camp Lejeune, especially as the Government learned more about those risks over the years. The Government concedes that *Feres* does not bar this claim, and we agree. However, we conclude that it is otherwise barred by another exception to Federal Tort Claims Act liability, the discretionary-function exception.

While the *Feres* doctrine may be broad, it is not all encompassing. The Supreme Court indicated in *United States v. Brown*, 348 U.S. 110 (1954), that *Feres* may not bar a service member's claim where the Government commits a separate wrongful act, resulting in injury, *after* the service member's discharge. *Id.* at 110–13 (finding *Feres* not to bar a serviceman's claim for severe nerve damage resulting from the Veterans Administration's application of a defective tourniquet during a post-service surgery for an injury received while in active-duty service); *see also Bradley v. United States*, 161 F.3d 777, 778–82 (4th Cir. 1998) (reversing district court's *Feres*-based grant of summary judgment to the Government for the wrongful-death claim of the estate of a servicewoman who died from an infection after being repeatedly turned away by military medical staff because, despite the possibility that the infection was merely a reoccurrence of a previous active-duty infection, the negligent medical treatment at issue was a separate act occurring *after* the servicewoman was placed on off-duty status).

Several other circuits have applied *Brown*'s rationale and found that "separate" or "independent" failure-to-warn claims arising after a service member's discharge are not barred by *Feres*. *Broudy v. United States*, 661 F.2d 125, 128 (9th Cir. 1981); *see, e.g.*, *Maas*, 94 F.3d at 296 (7th Cir.); *Cole v. United States*, 755 F.2d 873, 880 (11th Cir. 1985). In other words, a plaintiff "can maintain an action based on the [military]'s post-discharge failure to warn or treat the injured service person if the negligent act constituted a new and independent tort." *Maas*, 94 F.3d at 296 (quoting *M.M.H. v. United States*, 966 F.2d 285, 288 n.2 (7th Cir. 1992)). For a failure-to-warn claim to constitute "a new and independent tort," the duty to warn must arise *after* the service member's discharge. *See id.* If, by contrast, the duty to warn "originated when the injured serviceman was in the armed forces and merely continued after discharge" then the tort is not "separate," but a "continuing tort" barred under *Feres. Cole*, 755 F.2d at 876; *see also Minns v. United States*, 155 F.3d 445, 450 (4th Cir. 1998) (suggesting that a failure-to-warn claim arising during service would be barred under *Feres*).

Applying the rationale of *Brown* and its progeny, we find Plaintiff's failure-to-warn claim is not barred by *Feres*. Here, the initial injury "incident to service" was Clendening's exposure to toxic chemicals and hazardous substances while at Camp Lejeune. However, according to the complaint, the Government was not aware of any such exposure until 1979 or 1980. Therefore, any duty on the part of the Government to warn Clendening arose years after he left the service in 1973 and would constitute a "separate" and "independent" tort not incident to his military service.

16

However, this is not the end of our inquiry. The Government contends that, even if Plaintiff's failure-to-warn claim survives *Feres*, it is barred by the Federal Tort Claims Act's discretionary-function exception. As discussed next, we agree.

## C.

The Federal Tort Claims Act states that its limited waiver-of-sovereign-immunity provisions "shall not apply" to claims "based upon the exercise . . . or the failure to exercise . . . a discretionary function or duty on the part of . . . the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). To determine whether the discretionary-function exception applies, we employ a two-step analysis. *Wood v. United States*, 845 F.3d 123, 128 (4th Cir. 2017).

First, we "must determine whether the conduct in question 'involves an element of judgment or choice.'" *Id.* (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Conduct cannot be deemed discretionary where "a statute, regulation, or policy *prescribes* the [Government]'s conduct." *Id.* If the "challenged conduct is the product of judgment or choice," we proceed to the second step. *Id.* Under the second step, we consider whether the challenged conduct "is of the kind that the discretionary function exception was designed to shield," i.e., a decision "based on considerations of public policy." *Berkovitz*, 486 U.S. at 536–37.

## 1.

The first question is whether the Government's failure to warn was the product of discretion as opposed to mandate. We conclude that it was discretionary. Plaintiff fails to

identify any state, federal, or agency provision that would have required the Government to issue a specific warning to Clendening after his discharge.[9]

Plaintiff argues that the Government's actions were specifically prescribed by certain Department of the Navy Bureau of Medicine and Surgery ("BUMED") regulations which became effective in 1972.[10] Opening Br. at 34–37. She points to several provisions contained in BUMED 6240.3C which state, in part, that "[d]rinking water shall not contain impurities in concentrations which may be hazardous to the health of consumers." Dep't of the Navy, Bureau of Med. and Surgery, BUMED Instruction 6240.3C 7(d) (1972). Given the language of this provision, Plaintiff asserts the Government had no discretion to provide contaminated drinking water.

---

[9] At oral argument, Plaintiff's counsel argued for the first time that the Government's conduct violated two additional Navy regulations. Counsel also seemed to argue that discovery should have been granted to allow Plaintiff to discover what additional regulations the Government may have violated. However, Plaintiff never mentioned this argument or the two Navy regulations in her complaint or in any briefing before this Court. Nor did Plaintiff's counsel notify opposing counsel, or this Court, of his intention to rely on such authority. Because we generally "will not consider arguments not made in the briefs, but raised instead for the first time at oral argument," we decline to consider these regulations and the connected discovery argument. *United States v. Pena*, 952 F.3d 503, 511 (4th Cir. 2020), *as amended* (Mar. 11, 2020).

[10] Plaintiff also references the Atomic Energy Act of 1954 and the 1948 Water Pollution Control Act for the proposition that the Government had no discretion to pollute the water or bury nuclear waste at the base. Atomic Energy Act of 1954, Pub. L. 83-703, § 57, 68 Stat. 919, 932 (current version at 42 U.S.C. § 2077); Water Pollution Control Act, Pub. L. 80-845, 62 Stat. 1155 (1948) (amended 1972). Plaintiff does not fully flesh out these arguments. However, even assuming the Government did violate these statutes, its negligent conduct pertaining to Clendening was the exposure to these hazards. And, as discussed above, the exposure itself was incident to service and thus any resulting claims would be barred under *Feres*. Plaintiff does not clearly allege otherwise. Nor does she point to any provision outlining a duty to warn.

18

Even if that were true, this argument is not persuasive because the BUMED regulation contemplates only the drinking water itself; it says nothing about the need to provide *warnings*.[11] However, as noted above, any claims resulting from the exposure are barred under *Feres*.[12] What is critical here is whether the Government had a separate duty to warn Clendening of the exposure *after* it had occurred. Plaintiff points to no provision within BUMED 6240.3C establishing a mandatory duty to warn Clendening of his exposure.

Although not referenced in the complaint or Plaintiff's Opening Brief, the Government highlights two statutes enacted in the late 2000s which speak to a duty to warn

_____

[11] Indeed, the only provision in BUMED 6240.3C that even mentions a potential duty to warn is a comment in a footnote, not cited by either party, which states "the public should be warned of the potential dangers of using the water for infant feeding" in areas where the "nitrate or nitrite content of water is known to be in excess of the listed concentration." Dep't of the Navy, Bureau of Med. and Surgery, BUMED Instruction 6240.3C 7(d)(1) n.3. However, given the language of the comment, it is not clear that this single footnote creates a mandatory duty to warn. Even if it did, such a warning would not pertain to Clendening or the injuries he suffered since it is expressly limited to risks to infants from nitrates and nitrites.

[12] Plaintiff cites two district court cases, *Washington v. Dep't of the Navy*, 446 F. Supp. 3d 20 (E.D.N.C. 2020), and *Jones v. United States*, 691 F. Supp. 2d 639 (E.D.N.C. 2010), but they are distinguishable. While the courts in both *Washington* and *Jones* found the 1972 BUMED Instructions for Camp Lejeune to leave no room for discretion and to mandate a clean water supply, both involved exposure claims arising after 1972. *Washington*, 446 F. Supp. 3d at 22, 26–28; *Jones*, 691 F. Supp. 2d at 640, 642–43. Moreover, neither case involved claims stemming from the direct injury of a service member and neither court discussed *Feres*. *See Washington*, 446 F. Supp. 3d at 23, 25–29; *Jones*, 691 F. Supp. 2d at 640, 642–43. Instead, both cases focused on whether decision makers had discretion or could consider matters of policy *in determining whether to provide clean water at Camp Lejeune. See Washington*, 446 F. Supp. 3d at 25–29; *Jones*, 691 F. Supp. 2d at 642–43; *see also* Opening Br. at 30–31. That is a different question than one presented here: whether the Navy had discretion to decide whether and how to later warn Clendening about the extent and impact of his exposure.

19

service members of any exposure resulting from their time at Camp Lejeune. However, it contends that the language of these statutes permits discretion on the part of the Government. We agree.

Both cited statutes contain broad language, leaving numerous decisions involving elements of "judgment or choice" in the hands of the Government. The first statute states that "the Commandant of the Marine Corps shall *take appropriate actions* . . . to notify former Camp Lejeune residents and employees who may have been exposed to drinking water impacted by trichloroethylene and tetrachloroethylene." John Warner National Defense Authorization Act for Fiscal Year 2007, Pub. L. No. 109-364, § 318(b)(1), 120 Stat. 2083, 2143–44 (2006) (emphasis added). The second statute similarly provides that "the Secretary of the Navy shall *make reasonable efforts* to identify and notify directly individuals who were served by the system during the period identified in the study of the drinking water contamination to which they may have been exposed." National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 315(b), 122 Stat. 3, 56–57 (emphasis added).

There is some mandatory language included in both public laws. *See* § 318(b), 120 Stat. 2083, at 2143–44 ("shall take appropriate actions"); § 315(b), 122 Stat. 3, at 56–57 ("shall make reasonable efforts"). However, we have previously noted that "[t]he existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." *Holbrook v. United States*, 673 F.3d 341, 348 (4th Cir. 2012) (quoting *Miller v. United States*, 163 F.3d 591, 595 (9th Cir. 1998)) (finding the directive that "[t]he [Federal Aviation] Administrator shall issue

20

an airworthiness certificate when the Administrator finds that the aircraft conforms to its type certificate and, after inspection, is in condition for safe operation" could not be read to remove all discretionary "safety-related decisions" (citations omitted)). We have considered various statutes, public laws, and regulations containing some mandatory language, such as "shall," but found discretion remained with the Government where the "general, sweeping language" of the text did not remove all relevant decisions from their control. *Baum v. United States*, 986 F.2d 716, 721–22 (4th Cir. 1993); *see Holbrook*, 673 F.3d at 348–49.[13]

In the same way, the broad language of the high-level directives at issue here—that the Government shall "make reasonable efforts" and "take appropriate actions"—indicates that the Government "retains discretion regarding the implementation of those mandates." *Rich*, 811 F.3d at 145. Determining what is "reasonable" or "appropriate" necessarily involves elements of judgment and choice on the part of the Government. *See Baum*, 986 F.2d at 721–22, 722 n.2 (noting that the language of construction guidelines stating "[s]ubstantial railings along each side of the bridge shall be provided for the protection of traffic" was still "far too general to serve as a mandatory regulation governing the choice of guardrail post materials"). So those statutes, like the BUMED regulations, cannot support Plaintiff's claim that the Government had a mandatory duty to warn Clendening.

---

[13] *See also Clark v. United States*, 695 F. App'x 378, 385–86 (10th Cir. 2017) (explaining that "the mere use of verb forms that indicate mandatory action is insufficient as a matter of law for us to infer a non-discretionary function" and that "[w]here the regulatory language 'mandates' the consideration of alternatives, the weighing of factors, or the application of policy priorities bounded by practical concerns, the language leaves to the decisionmaker's discretion how best to fulfill such 'mandatory' priorities").

2.

Having concluded that the "challenged conduct is the product of judgment or choice," we turn to the second step of the discretionary-function analysis. *Wood*, 845 F.3d at 128. Under the second step, we consider whether the challenged conduct involved a decision "based on considerations of public policy." *Berkovitz*, 486 U.S. at 537. If the relevant "statute, regulation, or agency guideline[]" permits discretion, "it must be presumed that the [Government's] acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). This is a "strong presumption." *Id.* Thus, "[f]or a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Id.* at 324–25. This analysis centers on "the nature of the actions taken [by the Government] and on whether they are susceptible to policy analysis." *Id.* at 325. And in our analysis, "we do not 'inquire whether policy considerations *were actually* contemplated in making a decision.'" *Blanco Ayala v. United States*, 982 F.3d 209, 214–15 (4th Cir. 2020) (quoting *Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 208 (4th Cir. 2002)). Rather, our inquiry is objective, asking whether the challenged decision "is one which we would expect inherently to be grounded in considerations of policy." *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 858 (4th Cir. 2016) (quoting *Baum*, 986 F.2d at 721).

Courts have frequently found that "the [G]overnment's decision whether to warn about the presence of toxins, carcinogens, or poisons falls under the discretionary function

exception to the [Federal Tort Claims Act]'s waiver of sovereign immunity."[14] *Sánchez ex rel. D.R.-S. v. United States*, 671 F.3d 86, 101–02 (1st Cir. 2012) (collecting cases in which other circuits have held that the decision whether to issue a warning fell within discretionary-function exception). Indeed, as this Court and others have observed, "the decision to warn is 'replete with choices' and requires 'ascertaining the need for a warning and its cost,' 'determining the group to be alerted, as well as the content and procedure of such notice,' and ultimately, 'balanc[ing] safety with economic concerns.'" *Minns*, 155 F.3d at 452 (quoting *Maas*, 94 F.3d at 297); *see also Seaside Farm*, 842 F.3d at 859 (explaining that "decisions regarding [Salmonella] contamination warnings are 'grounded in the policy of protecting the public from a health risk, and reducing adverse economic impact'" and that "[d]iscretion is necessary to evaluate available information, assess the sufficiency and reliability of evidence, resolve conflicting data, determine the overall nature of a health threat, and ultimately settle on a course of action"); *Sánchez*, 671 at 101–02. Furthermore, where the Government has provided *some* warning or disclosure, the decision not to provide additional, earlier, or more urgent warnings may more clearly indicate the existence of policy choices than would a failure to provide any warning at all. *See Clark v. United States*, 695 Fed. App'x 378, 388 (10th Cir. 2017).

Here, we find that the Government's decision of how and when to warn implicates policy decisions. To issue warnings, the Government would need to "evaluate available

---

[14] Of course, not all decisions whether to warn will ultimately pass the discretionary-function test. *See, e.g.*, *Clark*, 695 F. App'x at 387–88 (comparing failure-to-warn claims against park services that were barred by the discretionary-function exception with those that were not).

information, assess the sufficiency and reliability of evidence, resolve conflicting data, determine the overall nature of a[ny] health threat[s]," *Seaside Farm*, 842 F.3d at 859, consider how to identify potentially exposed individuals, decide what type of medium or combinations of mediums would be the best way to convey the risk to those exposed, and weigh practicality and economic constraints. All these decisions implicate public policy, health, and safety concerns. *See, e.g.*, *id.*; *Maas*, 94 F.3d at 297–98.

Moreover, it appears that the Government provided at least some warnings, inadequate though they may be. Per the complaint, the Agency for Toxic Substances published a Public Health Assessment for Camp Lejeune in 1997, though it was taken down from its website in 2009. In 2011, the Government directed the Agency for Toxic Substances "to attempt to survey former Camp Lejeune employees' health conditions." J.A. 18. In December 2012, the Agency for Toxic Substances released a new report discussing the contamination of the water at Camp Lejeune and indicating that harmful chemicals, such as benzene and trichlorethylene, were found within the Hadnot Point Water Treatment Plant service area. Four years later, the Government ultimately "adopted regulations [stating] that . . . eight associated diseases . . . were presumed to have been caused by . . . exposure at Camp Lejeune." J.A. 18. Thus, the Government did provide some warnings, and its decision to not issue earlier warnings may very well have been due to any of the policy decisions discussed above.

We do not discount the severe harm Clendening suffered, allegedly due to exposure at Camp Lejeune. Nor do we conclude that earlier, more complete warnings would not have been helpful to him. However, "the discretionary function exception applies 'even if

24

the discretion has been exercised erroneously' and is alleged 'to frustrate the relevant [regulatory] policy.'" *Holbrook*, 673 F.3d at 350 (alteration in original) (quoting *Gaubert*, 499 U.S. at 338 (Scalia, J., concurring in part and concurring in the judgment)). As the statute specifies, the exception applies "whether or not the discretion involved [is] abused." 28 U.S.C. § 2680(a).

Because we find the discretionary-function exception of the Federal Tort Claims Act applies to Plaintiff's failure-to-warn claim, we affirm the district court's dismissal.

## III.

For the reasons stated above, we affirm the district court's dismissal of all of Plaintiff's claims for lack of subject-matter jurisdiction under Rule 12(b)(1).

*AFFIRMED*